DONNELLY GARMENT CO. et al. v. INTERNATIONAL LADIES' GARMENT WORKERS' UNION et al. (DONNELLY GARMENT WORKERS' UNION et al., Interveners).

No. 2924.

District Court, W. D. Missouri, W. D.

Dec. 31, 1937.

In Equity. Suit by the Donnelly Garment Company and another, against the International Ladies' Garment Workers' Union and others, for injunctive relief and protection from and against alleged unlawful acts of defendants in seeking to compel plaintiffs to force their employees to join the defendant union, wherein the Donnelly Garment Workers' Union and others intervened.

See, also, 20 F.Supp. 767.

Reed & Ingraham and Hogsett, Murray, Trippe & Depping, all of Kansas City, Mo., for plaintiffs.

Frank P. Walsh, of New York City, and Roy Rucker, Jerome Walsh and Clif Langsdale, all of Kansas City, Mo., for defendants.

Frank Tyler, of Gossett, Ellis, Dietrich & Tyler, all of Kansas City, Mo., for interveners.

Before VAN VALKENBURGH, Circuit Judge, and REEVES and OTIS, District Judges.

VAN VALKENBURGH, Circuit Judge.

Plaintiffs are corporations, organized and existing under the laws of the state of Missouri, engaged in the manufacture and sale of ladies' garments and wearing apparel, under the trade-mark "Nelly Don." Said companies, as manufacturer and sales department, have built up a large market for said garments and a wide and profitable business throughout the states of the Union.

Plaintiffs in their amended bill have brought suit against the International Ladies' Garment Workers' Union, David Dubinsky, its president, several of its other officers, Meyer Perlstein, its southwest regional director, Wave Tobin, manager of its Kansas City Joint Board, and various other members of the International Union, charging that said defendants are engaged in an unlawful confederation and conspiracy to force plaintiffs' employees to join the defendant union, and to compel plaintiffs to force said employees to join defendant union. That for years past the defendants, with other persons united with them, have been, and now are, engaged in a general combination and conspiracy to force all persons, firms, and corporations engaged in the manufacture and sale of ladies' garments in interstate commerce, including plaintiffs herein, to organize their employees into an organization to be part and parcel of the defendant union with the intent thereby to control the employment of labor in, and the operation of, all said business, and to extort from said workers large sums of money by way of dues, fines, penalties, and other exactions; that, in order to carry out such conspiracy and scheme, it was and is the purpose to destroy the interstate trade and commerce of such persons, firms, and corporations, their employees and customers in the several states, until such time as, from the damage and loss of business resulting therefrom, the said employers will yield to defendants' demands and force their employees to join the defendant union and submit to the domination and control of the said union and its officers, thereby denying to such employees the right to bargain for and fix their own wages and conditions of labor, in dealing with their employers, free from influence, domination, and coercion.

It is further charged in the bill of complaint that defendants, in furtherance of said scheme and conspiracy, have organized bodies of lawless persons, not employees of the particular plant to be assaulted, and have caused said gangs to attack the employees of various plants, and to threaten them with great bodily harm if they continue to work and refuse to join the defendant union; that said gangs have assaulted employees who desired to continue their work, most of whom were women, with fists and weapons, tearing of hair, and stripping of clothing, and have threatened

other physical harm to them and their families. Such employees have been assaulted on their way to and from work, and have, by violence and force, been prevented from gaining ingress to and egress from their places of business. That in furtherance of said scheme and conspiracy defendants have published and circulated false and libelous reports about the plaintiff companies, and have taken steps to inaugurate secondary boycotts against their customers and their merchandise in various states of the Union; that unlawful acts of this nature have been done and perpetrated against several garment companies in Kansas City within the past few months, and similar reprisals against these plaintiffs have been threatened.

The amended bill of complaint pleads that "this is a suit of a civil nature in equity, wherein the matter in controversy exceeds, exclusive of interest and costs, the sum and value of $3,000.00, and which suit arises under laws of the United States known as the Sherman Act [15 U.S.C.A. §§ 1–7, 15 note] and Clayton Act [38 Stat. 730], including U.S.Code [title 15], sections 1, 4, 7, 8, 12, 15, and 26 [15 U.S.C.A. §§ 1, 4, 7, 8, 12, 15, 26]." It prays injunctive relief and protection from and against the alleged unlawful acts threatened.

For their protection the Donnelly Garment Workers' Union and employees of plaintiffs have filed a bill of intervention which is in full harmony with the relief prayed in the bill of complaint, but also seeks protection against coercion from any source, even against compliance of the Donnelly Companies with the demands of defendants, which would incidentally and necessarily impose upon these employees an association against their will. This bill of intervention challenges the constitutionality of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., if it should be held to apply, in addition to asserting a denial of its application.

Defendants generally have filed a motion to dismiss, and certain defendants have filed a motion to vacate the temporary restraining order, a plea in abatement, and a separate answer. In this motion, plea, and answer a number of grounds are stated; but it developed at the hearing, and was announced by counsel for defendants, that the real, if not the only, ground of defense relied upon was the contention that the Norris-LaGuardia Act applies, and deprives this District Court of jurisdiction.

The injection of the constitutional issue by the petition of intervention required submission to a court composed of three judges; and the jurisdiction thus acquired must be extended to a complete determination of the questions presented.

■ The employees of the Donnelly Garment Companies, over 1300 in number, have completed an organization known as the "Donnelly Garment Workers' Union." They have negotiated with their employers a contract which provides specifically for the wages, hours, terms, and conditions of their employment that are entirely satisfactory to both parties. So far as this hearing shows, they are unanimous in this attitude, and have declared their opposition to affiliation with the defendant union, or with any other unrelated organization. Among these employees there are no members of the defendant union shown by the evidence, and no division exists among them. The proofs overwhelmingly establish that they are neither company inspired nor dominated. To insure their full independence of action, they have consulted able counsel of their own choosing, and have perfected their organization in full accord with the provisions of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Inasmuch as no division exists in that organization, and since no complaint from any source has been lodged with the Labor Board, challenging the good faith of this union, the proper selection of its bargaining representatives, nor the terms and conditions of its contract of employment, no necessity exists for enlisting further the functions of any Labor Board, nor the provisions of the National Labor Relations Act. National Labor Relations Board v. Delaware-New Jersey Ferry Co., 3 Cir., 90 F.2d 520, certiorari denied 58 S.Ct. 141, 82 L.Ed. ——.

In the cited case the National Labor Relations Board had taken cognizance of a complaint of unfair practices, and asked enforcement of its order commanding the Ferry Company to desist from refusing to bargain collectively with the Marine Engineers' Beneficial Association as the exclusive representative of engineers-employees of the Ferry Company. The court, declaring that the primary purpose of the National Labor Relations Act was to "obviate appeals to brute force which often accompany labor disputes," found that the employee engineers had unanimously entered into a contract with the company on terms

acceptable to them, and declined to enforce the board's order. In the course of the opinion Judge Dickinson said: "There is now no controversy; no complaint; no grievance. * * * There is in consequence nothing to negotiate."

This decision was made despite the fact that the matter had been before the Labor Board upon complaint of unfair practices, and that Board had found that the Marine Engineers' Beneficial Association had been, and still was, the representative of the licensed engineers for collective bargaining. Nevertheless, the unanimous action of the employees was made conclusive. In the case at bar, no complaint has been filed, and the employees of the plaintiff companies have acted unanimously in the selection of their representatives and in the negotiation of their contract.

The Donnelly Companies do an aggregate annual volume of business of $5,000,000. Customers residing and doing business in many states outside the state of Missouri purchase more than 80 per cent. of the "Nelly Don" garments manufactured in Kansas City, and commitments for hundreds of thousands of dollars worth of raw materials used in such manufacture have already been made, and are recurringly made, in the conduct of the business. The combination charged will interrupt the free flow of raw materials from foreign countries and states outside the state of Missouri, and the free flow of such manufactured garments from the state of Missouri to states and points outside. Therefore, the National Labor Relations Act applies to plaintiffs under the authority of National Labor Relations Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, as held in National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 57 S.Ct. 645, 81 L.Ed. 921, 108 A.L.R. 1352, where a manufacturer of garments had its factory in Virginia, but imported its cloth from other states and sold almost all of the finished products in other states. The Anti-Trust Act "prohibits any combination which essentially obstructs the free flow of commerce between the States, or restricts, in that regard, the liberty of a trader to engage in business; and this includes restraints of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of interstate trade except on conditions that the combination imposes." Loewe v. Law-lor, 208 U.S. 274, 28 S.Ct. 301, 52 L.Ed. 488, 13 Ann.Cas. 815. It was further held that: "A combination of labor organizations and the members thereof, to compel a manufacturer whose goods are almost entirely sold in other States, to unionize his shops and on his refusal so to do to boycott his goods and prevent their sale in States other than his own until such time as the resulting damage forces him to comply with their demands, is, under the conditions of this case, a combination in restraint of interstate trade or commerce within the meaning of the Anti-Trust Act of July 2, 1890 [15 U.S.C.A. §§ 1–7, 15 note], and the manufacturer may maintain an action for threefold damages under § 7 of that Act [15 U.S.C.A. § 15 note]."

That was an action for damages, but the situation would call for injunctive relief in a case of irreparable injury, and inadequate remedy at law. The case of Apex Hosiery Company, a garment company similarly situated with respect to interstate commerce, is aptly in point. Apex Hosiery Co. v. Leader et al., 3 Cir., 90 F.2d 155.

The bill sets out with particularity the acts of defendant union through its officers and members which have been committed or threatened in furtherance of the conspiracy charged. It cites a wide campaign of publicity through public meetings, publications and pamphlets charging that the Donnelly Company was in effect a sweat shop, enforcing wage scales far below those essential to proper standards of living, much lower than those existing generally in the industry, oppressive hours of work, denial of collective bargaining, and so-called "speed-up" methods injurious to health. These charges are branded as fraudulent. Certain it is that they have been shown to be wholly unfounded by the great weight of the evidence. The plaintiff companies are among the foremost in this industry in working conditions. Such is the testimony of hundreds of the present employees, and is shown by comparison with conditions existing in other garment shops in this industrial district. In furtherance of this campaign, the defendant Perlstein, regional director of the defendant union, on or about June 9, 1937, caused to be published a full-page statement announcing a drive to organize the workers in the Donnelly plant; that a large fund, approximating $100,000, had been appropriated for that purpose; and that these workers would ultimately be forced to join the

defendant union. Pursuant to this plan a number of women, agents of the union, were sent into several states to contact the Donnelly customers there, to urge them to cease their patronage, and in some cases threatening a secondary boycott and picketing if such customers failed to comply.

In support of their contention that physical violence was contemplated, in addition to the other acts recited, plaintiffs produced evidence of the methods employed by this same union, its officers and agents, in Dallas, Tex., in St. Louis, and elsewhere; particularly in Kansas City. Acts of violence, including beatings, tearing of hair, removal of clothing, and the like, were pleaded and proved. In Kansas City, strikes against garment companies on Broadway were accompanied by such methods. In the spring of 1937, a strike was inaugurated against three garment companies located on different floors of the same building near Twenty-Sixth street and Grand avenue. It started with a "sit-down" in the hall and on the stairway to prevent entrance to the work rooms. This phase was subsequently discontinued only because of the resulting unsanitary conditions. Thereafter, a large number of so-called pickets, composed of striking employees and sympathizers from other industries, assembled in mass at the entrances of the building and sought, with a large measure of success, to prevent access and egress by employers and employees who desired to continue their work. In the course of these efforts the acts of violence charged were committed. Moving pictures and photographs were exhibited to the court and were more eloquent than the spoken testimony. Police were almost in constant attendance and strove to keep the mob under control, but with indifferent success. At last resistance was broken down, and the companies were compelled to contract with the defendant union.

Throughout this strike, as in those on Broadway, the defendant Perlstein was in command. The defendant Wave Tobin was in charge of the pickets. The campaign against plaintiffs is organized by the same management, the same affiliation, and the same personnel. It is flatly asserted that the same methods will be employed, and plaintiffs and interveners are seriously threatened with the same acts of violence. The defendant Tobin insists violence is not contemplated, but her testimony in her deposition is significant:

"Q. Who had charge of the strike activities in connection with the Gernes, Gordon, and Missouri strikes? A. I had charge of the picket line.

"Q. How many pickets did you have at each plant? A. They varied. I don't know.

"Q. Was there any violence? A. Yes, there was some.

"Q. Were you there pretty constantly? A. Yes, I was.

"Q. Is there always violence in such strikes, or, rather, not always; is there usually violence in such strikes? A. We never intend that there should be violence. When you have two, or three, or four hundred girls out on the street, things will happen that you have no control over.

"Q. What kind of things? A. Well, I mean trying to get in to work, girls trying to keep them out. They may lose their temper, either side."

This blandly ignores the obvious fact that the mere physical act of preventing employees from entering upon their work is in itself an act of violence. The moving pictures disclosed Mrs. Tobin in constant attendance, as she says she was, while these violent occurrences were taking place, in charge of the pickets, and making no attempt, over a period of many days, to control these unlawful methods. She claims she could not control such a large body; but her testimony, as well as her conduct, implies approval of this physical interference with ingress to the plants.

These local strikes to which reference has been made and this threatened action against plaintiffs were and are initiated and financed by the defendant union, its officers and representatives. United Mine Workers v. Coronado Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762.

As heretofore stated, counsel for defendants announced that the real, if not the only, ground of defense relied upon was the contention that the Norris-La-Guardia Act deprives this court of jurisdiction. This contention is based entirely upon the definitions of terms and words contained in section 113, 29 U.S.C.A., section 13, of the act. The public policy of the United States declared in section 102, 29 U.S.C.A., section 2, of the act is that the individual worker shall have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and con-

ditions of his employment and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives, or in self-organization, or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. In the course of the substance of this declaration these significant modifying words are inserted: "He (the worker) should be free to decline to associate with his fellows." The general provisions of the act must be construed and interpreted in conformity with the public policy thus declared. It will be seen that, although in section 113 a "labor dispute" is defined as including controversies in which the disputants may not stand in the proximate relation of employer and employee, nevertheless the relationship of employer and employee is of the essence of the purpose and policy declared. That purpose is to protect employees in their freedom of association and action in the designation of bargaining representatives, in negotiating the terms and conditions of their employment, and in their right to decline to make associations against their will. The specific employment in which the freedom of association and negotiation is guaranteed is the unit. Interference and coercion on the part of employers is prohibited; and, if the employee is to be assured of actual liberty of contract, and freedom of association, coercion from any source must likewise be prohibited. The definitions of labor disputes embraced in section 113 of 29 U.S.C.A. must, therefore, be confined to cases which involve and concern such exercise of freedom of action on the part of employees with which the declared public policy deals, otherwise a substantial provision of that declaration must be ignored.

The Circuit Court of Appeals of the Seventh Circuit has held that the term " 'labor dispute,' as used in [this statute], comprehends disputes growing out of labor relations and implies the existence of relation of employer and employee." United Electric Coal Companies v. Rice, 80 F.2d 1. In this case the real controversy was between two mine workers' unions. Appellant had no dispute with its employees. The struggle was between the two unions over who should represent the employees. An injunction was granted, and certiorari was denied. In Newton et al. v. Laclede Steel Company, 80 F.2d 636, the same court adhered to the conclusion expressed in the Rice Case, and held that the extent to which an injunction may go in such cases depends upon the facts in each case. Later, in Lauf v. Shinner & Co., 82 F.2d 68, the same court reaffirmed its conclusion in the Rice Case, and held that acts and attempts to coerce an employer to compel employees to join a defendant union were unlawful under federal and state statutes, involved no labor dispute within the Norris-LaGuardia Act, and were properly enjoined. A number of District Court decisions are to the same effect; others to the contrary.

In Levering & Garrigues Co. v. Morrin, 2 Cir., 71 F.2d 284, the Norris-LaGuardia Act was held to apply to the situation there presented. In this case also the Supreme Court denied certiorari. 293 U.S. 595, 55 S.Ct. 110, 79 L.Ed. 688. Judge Manton's opinion was occupied largely with a discussion of the power of Congress to limit the jurisdiction of inferior federal courts, and the constitutional exercise of that power. The Seventh Circuit, in the Lauf Case, considered this and other cases upon which defendants herein especially rely, and did not feel justified in following the conclusions there reached for the reasons stated; either that the facts were not closely analogous, or that proper consideration and heed had not been given to the public policy defined in the act.

Counsel for defendants stress the case of Senn v. Tile Layers Protective Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229. The controlling consideration in that case is stated in the first paragraph of the syllabi: "The questions of what constitutes a 'labor dispute' within the meaning of Wisconsin Labor Code, § 103.62, and what acts done by a labor union are among those declared lawful by § 103.53, are questions of state law."

In the opinion Justice Brandeis emphasizes the rule that upon such questions the judgment of the highest court of the state is conclusive. It is repeatedly stated that the acts done and contemplated were peaceful, and without violence, threats, or intimidation directed against customers and employees. A secondary boycott was prohibited by the act. Certain methods of this nature, at first employed, had been discontinued, and the court treated an agreement of counsel on this point as disposing of the claim for relief on this ground. We do not find that this decision with the significant reservations contained in the

opinion, aids the contention of defendants' counsel.

There is here presented no bona fide dispute as to wages, hours, terms, and conditions of employment. Stripped of all extraneous matter, the sole actual demand is that the Donnelly Company shall unionize, (and thereby compel the unionization of its employees) as an affiliate of the C. I. O. which appears to have succeeded the A. F. of L. as the patron and supervisor of the defendant union. This is part of an avowed plan to compel all industries, irrespective of local conditions, to be placed on the same footing, thereby creating combinations and monopolies, resulting necessarily in higher cost of production and in restraint of trade. This was made evident at the hearing by statements of counsel for defendants, through the contract between the St. Louis Affiliated Industries and this garment union, and by proceedings incidental to the fixing of a garment code under the N. R. A. which were introduced in evidence by defendants at this hearing. This campaign contemplates the establishment of absolutely uniform hours and wages throughout the nation, regardless of differences in living and working conditions and the efficiency of labor in different sections.

■■■ No law of the United States confers upon the defendant union the right, power, or authority to compel affiliation with a specific union against the will of employees. If appropriate at all as an economic measure, its propriety is addressed, not to private associations, but to the Congress, there to be announced in no uncertain terms. This involves no criticism of labor unions as such. They have long been recognized by the courts to give laborers opportunity to deal on equality with their employers. From this arose the theory of the strike. Employees united to exert influence upon their employer and to leave him in a body in order, by this inconvenience, to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. Such activities, however, should not go beyond the use of lawful and peaceful propaganda to enlarge membership. American Steel Foundries v. Tri-City Central Trades Council et al., 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189, 27 A.L.R. 360. The employment of force and coercion is in direct conflict with the declaration of public policy in the Norris-LaGuardia Act, which guarantees to each individual worker freedom to decline to associate with his fellows. Refusal to accede to any unauthorized and unwarranted demand can in no sense be termed a "dispute." In the instant case that demand is sought to be enforced by strong-arm physical methods. That the contemplated acts of defendants, charged and proved, are unlawful, as declared by federal courts, by the Supreme Court of Missouri, and generally, admits of no doubt, Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 38 S.Ct. 65, 62 L. Ed. 260, L.R.A.1918C, 497, Ann.Cas.1918B, 461; Duplex Co. v. Deering, 254 U.S. 443, 466, 41 S.Ct. 172, 176, 65 L.Ed. 349, 16 A. L.R. 196; American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360; Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; United Electric Coal Companies v. Rice, 7 Cir., 80 F.2d 1; Lauf v. Shinner & Co., 7 Cir., 82 F.2d 68; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468; Hughes v. Motion Picture Machine Operators, 282 Mo. 304, 221 S.W. 95; and where the injury threatened is present and real, and will become irreparable if relief be postponed, the protection of a court of equity is properly invoked. In their sworn bill plaintiffs have alleged that the unlawful acts charged have been threatened, that substantial and irreparable injury to their property will follow, and that they have no adequate remedy at law. It is obvious that the denial of relief, in any case, would inflict greater injury upon plaintiffs than its granting would inflict upon defendants; and it is pleaded and proved that, in the similar cases recited, the public officers of the city have been unable to furnish adequate protection.

The hearing before this court was an extended one in which both parties were permitted to introduce all desired material evidence and testimony, written or oral. The Supreme Court has commented adversely upon objections and contentions which are "based on strained and unnatural constructions of the words of the Norris-LaGuardia Act," and which "conflict with its declared purpose, section 2 (29 U.S.C.A. § 102), that the employee 'shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or

in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.'" Virginian Railway Co. v. System Federation, 300 U.S. 515, 563, 57 S.Ct. 592, 607, 81 L.Ed. 789.

There is here presented no division of opinion among employees upon which could be based even a plausible or colorable right on the part of defendants to act as bargaining representatives. But more than that, no such claim is in fact asserted. The frank objective is the unionization of plaintiffs as affiliates of the defendant union, thereby automatically unionizing the employees, in order that the control of this defendant union may be nationwide and all-embracing, and this in the face of the declared public policy invoked. It is unthinkable that the rejection of such a demand, as against the will of these employees, and in conflict with obligations freely entered into, can be tortured into the conception of a "dispute."

Interveners have organized under the National Labor Relations Act and invoke the protection that must flow from its provisions. For the months intervening since their organization, no complaint has been filed with the National Labor Relations Board, and no challenge to that organization has been made. Such action was open to defendants, if desired, but has not been availed of, presumably because no tenable ground was found to exist. They have elected to coerce plaintiffs to join their association by the employment of methods denounced by all courts, by the terms of the Norris-LaGuardia Act itself, and in conflict with the declaration of public policy therein contained. By strained and unnatural constructions of the definitions contained in that act, thus made to conflict with its declared aim and purpose, they seek to deprive this court of jurisdiction to grant the relief prayed. The Norris-LaGuardia Act has no application to the controversy here presented. In such case, jurisdiction being clear, courts of equity will grant relief in accordance with their inherent powers and established procedure. A delicate question is presented when the jurisdiction of the court is challenged upon the ground here urged. However, when that jurisdiction is apparent, the duty remains to grant relief, if demanded and justified, under the established rules and usages of courts of equity.

The conclusion we have reached renders it unnecessary to resolve the constitutional question presented. In general, we may say that this statute, limiting the power of inferior federal courts to grant injunctions in cases of labor disputes, is a valid exercise of the power of Congress. United Electric Coal Companies v. Rice et al., 7 Cir., 80 F.2d 1. This case, however, does not involve such a dispute.

It follows that the temporary injunction prayed will be granted and findings of fact will be filed in harmony herewith.

REEVES, District Judge (concurring).

I concur in the able opinion of Judge VAN VALKENBURGH, but, in doing so, I desire to make the following observations:

No more unusual action has ever perplexed the mind of a judge. In this case, an important industry has filed its bill, wherein it seeks the protection of the court against the alleged unlawful aggressions and transgressions of the defendants. None of the defendants sustain any business relationship whatever to the plaintiffs. All of the employees of plaintiffs' manufacturing establishment in their capacity as an organized labor union have joined by intervention with the plaintiffs. They, too, ask the protection of the court against what they deem to be wrongful acts and menacing threats of the defendants.

In limine, the defendants, hardly disputing the averments of the several bills, challenge the jurisdiction of the court to grant the relief sought. If the averments of the original bill of the plaintiffs and those of the intervening petition of the organized employees are true (and the testimony at the hearing tends to support the averments), then there must be some unusual limitations upon the court's power to prevent the granting of relief to which the plaintiffs and interveners under ordinary circumstances would be entitled.

It is the contention of the defendants that a labor dispute has arisen between them on the one side and the plaintiffs and interveners on the other, and, that perforce certain congressional enactments, the jurisdiction of the national court has been so limited and impaired that, upon the facts in the case, injunctive relief cannot be granted.

The plaintiffs, Donnelly Garment Company, a corporation, and Donnelly Garment

Sales Company, a corporation, are engaged in the manufacture and sale of ladies' garments and wearing apparel. The factory is located in Kansas City, Mo., and the sales of its product are carried on throughout the United States.

The Donnelly Garment Workers' Union is an unincorporated association, and is composed of all of the employees of Donnelly Garment Company. In round figures there are approximately 1,300 persons employed in said industry, all of whom are members of the plant union. Such union is organized, according to the averments of the intervening bill, in conformity with the provisions of the several national labor acts, and particularly under section 157, title 29 U.S.C.A., relating to the general subject of Labor. This section provides: "Employees shall have the right to self-organization * * * to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

The defendants are either interested in, or members of, a labor union organization known as International Ladies' Garment Workers' Union. These persons and such organization are, or have been, engaged in the same industry, trade, craft, or occupation. They are endeavoring to bring into their organization all of the employees of factories, such as that of plaintiff Donnelly Garment Company, throughout the United States. The object of such movement, as stated by them, is to raise the standards of wages and working conditions in all garment factories of the country. As part of such endeavor, they insist upon a right to bring the employees of Donnelly Garment Company into their union.

To effect their purpose, it is averred, they have employed coercive methods and hurtful means. They have endeavored to effect a boycott against the products of plaintiff and have misrepresented the facts concerning wages and working conditions in plaintiff's garment factory. Moreover, the conduct and utterances of the defendants, as it is further averred, carry a menace and threat of violence and harm to the employees of the garment company, the interveners in this action.

Other facts, as they may become pertinent, will be stated in the course of this memorandum opinion.

1. The evidence at the hearing tends to support the averments of the original bill, as well as those of the intervening petition, to the effect that the defendants were employing unlawful means to effectuate their purpose.

However, it is stoutly maintained by defendants that the plaintiffs, in asking for injunctive relief, have failed to follow the procedure prescribed in what is known as the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., approved March 23, 1932.

By section 107, title 29 U.S.C.A., such act forbids the issuance of an injunction "in any case involving or growing out of a labor dispute, * * * except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint."

Admittedly, the procedure outlined by this act was not followed. A question naturally arises, therefore, as to whether or not there is in fact a labor dispute so as to make mandatory the application of this statute.

2. The Norris-LaGuardia Act, while omitting a definition as to what constitutes a labor dispute, nevertheless defined or designated the classes of persons who might be parties to a labor dispute. This definition was all comprehensive and did not limit such persons to those who sustain an employment relationship to the employer. The statute also defines the subject-matter of labor dispute as being questions of wages and working conditions and labor representations or bargaining agencies. The failure of Congress to define what constitutes a bona fide labor dispute has left the question open for judicial determination. An accepted definition is as follows: "A fact is properly said to be in dispute when it is alleged by one party and denied by the other, and by both with some show of reason." 1 Bouv. Law Dict. Rawle's Third Rev., p. 888.

The Norris-LaGuardia Act was supplemented, if not modified, by the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., approved July 5, 1935. The latter act contained a declaration of public policy practically the same as the Norris-LaGuardia Act. This public policy, among other things, asserted the right of the individual laborer to enjoy "freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, re-

straint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." Section 102, title 29 U.S.C. A.

The magna charta of labor is contained in section 157, title 29 U.S.C.A., and is a part of the National Labor Relations Act. It provides that: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection."

This section enables the employees of any manufacturing establishment to exercise a choice as to whether they shall form their own organization or join and assist other organizations outside the plant. It was a right vouchsafed to employees, and in the exercise of such right such employees were offered protection against coercion or interference by employers.

According to the testimony in this case, all of the employees of Donnelly Garment Company formed an organization pursuant to a right vouchsafed to them by the above statute. The fact that it may have been more or less informal, and that its charter and by-laws do not contain the details sometimes found in such organizations, does not militate against its validity or its good faith. The simplicity of the organization is not condemnatory. Moreover, the Congress in the National Labor Relations Act established a tribunal known as the National Labor Relations Board, whose function it was and is, among others, to adjust all questions arising on the good faith of plant labor organizations.

By section 159, title 29 U.S.C.A. it is provided that: "(a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment."

By paragraph (b) of said section, it is significantly provided: "The Board shall decide in each case whether, in order to insure to employees the full benefit of their right to self-organization and to collective bargaining, and otherwise to effectuate the policies of this chapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

And then, by paragraph (c) of the same section: "Whenever a question affecting commerce arises concerning the representation of employees, the Board may investigate such controversy and certify to the parties, in writing, the name or names of the representatives that have been designated or selected. In any such investigation, the Board shall provide for an appropriate hearing upon due notice," etc.

It must be obvious, upon a casual reading of the several acts involved, that the question of the bona fides of a plant labor organization is committed to the National Labor Relations Board. Any one challenging or disputing its validity must resort to the Board. Upon failure to do so, the employer, the courts, and every one else, in considering the acts of such organization, must accept it as validly organized and acting in good faith. All the presumptions of the law require this.

Assuming therefore, as must be done, that the Donnelly Garment Workers' Union is a bona fide labor organization under the statute, then the rights and the freedom vouchsafed to it by statute must repel from the plaintiff company any rights whatever that may have previously existed in or for the defendants.

The bills averred, and the testimony showed, that the labor organization within the industry had contracted with the employer concerning wages and working conditions and that this contract was in force at the time the bill was filed. This being true, both the employer and the employees were standing firmly on statutory ground. The employer could not forbid a labor organization within the industry, nor could the employer coerce such organization. According to the evidence each one had observed, complied with, and was obedient to statutory mandates and prohibitions.

Upon these undisputed facts the defendants could not properly assert or rightfully maintain a dispute with the plaintiffs or their organized employees for the reason that "one has no constitutional right to a 'remedy' against the lawful conduct of another." Senn v. Tile Layers Protective

Union, 301 U.S. 468, 57 S.Ct. 857, 864, 81 L.Ed. 1229.

This reasoning does not run contrary to the comprehensive provisions of the congressional acts which most liberally admit into the domain of lawful dispute persons not employees. The reason for this liberal congressional attitude may be found in the case of American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 78, 66 L.Ed. 189, 27 A.L.R. 360, where the court said that organized labor would not effectively reach its desired ends unless the combination extended "beyond one shop." The reason for this rule, as stated by the court, was, "because in the competition between employers they are bound to be affected by the standard of wages of their trade in the neighborhood. Therefore, they may use all lawful propaganda to enlarge their membership and especially among those whose labor at lower wages will injure their whole guild. It is impossible to hold such persuasion and propaganda without more, to be without excuse and malicious."

In the absence of a factory labor organization, the defendants, though not sustaining the relationship of employees to plaintiff, nevertheless would have had the right to insist upon projecting their union into the plant of the plaintiff. This right, however, was limited and liable to be counteracted and even destroyed, when the Congress provided for self-organization among employees of individual factories. When so organized, the reason for the right in defendants no longer existed. It was the view of Congress that individual laborers were capable of self-government and that a local organization, through its representation, could obtain the same favorable results toward labor as could an outside and even larger organization.

The factory organization was designed to consummate all the purposes which the defendants may at one time have had a right to undertake to effectuate.

Under these circumstances, there being no labor dispute (in fact there could be none), the acts and the conduct of the defendants were unlawful, and both the plaintiffs, as well as the interveners, were entitled to the protection of the courts against the infringement of their rights.

3. Another question obtrudes itself: A dispute as heretofore defined means the assertion of a fact by one party and denial by the other, when both the assertion and the denial have a show of reason. The averments of the bill supported by evidence were to the effect that the so-called labor dispute in this case was not in good faith. All of the testimony shows that the interest of the defendants was merely in bringing the employees of plaintiff's company into the International Ladies' Garment Workers' Union. The evidence showed that the original demand made upon the plaintiff was solely for that purpose, and that such demand was not predicated upon any existing fact.

It was contended by the defendants that several years previously certain employees were discharged because of union activities. This was disproved, but, even if true, it was at a time when the plaintiff had a right to discharge employees for such activities. New conditions and new statutes excluded the act, even if it occurred, as a basis for dispute, discussion, or argument.

If the dispute was predicated on fraud, then under the express provisions of both the Norris-LaGuardia Act and the National Labor Relations Act, it could not be a basis for limiting the jurisdiction of the court.

By section 104, title 29 U.S.C.A., the injunctive process is limited only in those cases where the acts are deemed "not involving fraud or violence," or, "without fraud or violence."

As stated by able counsel in argument, a superstructure upon a foundation of fraud cannot stand.

4. Another matter that calls for brief discussion is the question whether plaintiff manufactures silk or cotton garments. The evidence was overwhelming that it is the latter.

Moreover, it appeared that wages and working conditions were of a higher standard in plaintiff's factory than in those factories engaged in kindred operations where the defendant union was the bargaining agency.

In view of the above, a temporary injunction should be granted.

OTIS, District Judge (dissenting).

I regret exceedingly my inability to concur with my associates in the disposition of this case. The great respect I entertain for them ordinarily would lead me to yield my views to theirs. Added to that reason for concurrence is the prompting which proceeds from a disinclination to make ef-

fective a statute originating in an unwarranted distrust of the judges of the United States.. The Norris-LaGuardia Act is only another of a series of acts enacted and threatened to be enacted through which runs the assumption that judges, although appointed by the President by and with the advice and consent of the Senate, either at the time of their appointment or immediately thereafter (as the result of a strange metamorphosis that then comes over them), really are not possessed of either impartiality or integrity. Perhaps the humiliation which this assumption would inflict is a little lessened by the realization that such a statute is enacted not so much to enable men to escape the judges as to escape the law. There is an unintended compliment in legislation which recognizes that the judges will stand firm in obedience to their oaths to support the Constitution and the laws, and that the thing to do, if the law is to be avoided, is to avoid the judges.

I should like to concur, but I cannot do that conscientiously when it is so clear to me that Congress has prohibited an injunction in a case involving or growing out of a labor dispute except upon conditions not complied with here, that what we have here does involve or grow out of a labor dispute, and that Congress has the constitutional power to enact the legislation which it has enacted.

## Is This a Labor Dispute?

1. Laying aside the question as to whether the law as embodied in the Norris-LaGuardia Act in some way was modified by the later National Labor Relations Act, and the further question as to the constitutionality of the Norris-LaGuardia Act, we come at once to what undoubtedly is the prime question in this case. Does the Norris-LaGuardia Act prohibit just such an injunction as is sought here unless there is compliance with the requirements of that act?

The act provides expressly as follows:

Section 1, title 29 U.S.C. § 101, 29 U.S. C.A. § 101. "No court of the United States * * * shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter."

Section 7, title 29 U.S.C. § 107, 29 U.S. C.A. § 107. "No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—

"(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat, or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

"(b) That substantial and irreparable injury to complainant's property will follow;

"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

"(d) That complainant has no adequate remedy at law; and

"(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

"Such hearing shall be held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to the chief of those public officials of the county and city within which the unlawful acts have been threatened or committed charged with the duty to protect complainant's property."

Section 13, title 29 U.S.C. § 113, 29 U. S.C.A. § 113. "When used in this chapter, and for the purposes of this chapter—

"(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more em-

ployees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as hereinafter defined) of 'persons participating or interested' therein (as hereinafter defined).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Now the principal parties to this controversy are: (1) The Donnelly Garment Company (one of the plaintiffs, hereinafter referred to as the plaintiff); (2) the Donnelly Garment Workers' Union (an intervener); and (3) the International Ladies' Garment Workers' Union (one of the defendants, hereinafter referred to as the defendant). The controversy is described in plaintiff's amended petition in the following words:

"* * * That the defendants * * * have engaged in and are now engaged in an attempt to disrupt said Donnelly Garment Workers' Union and to cause it and its members to break their * * * contract with plaintiff companies * * * ; that they have sought and are seeking to force said employees to join said defendant union and to compel the plaintiffs to force them to join said defendant union. * * *

"* * * For many years defendants * * * have been and are now engaged in a general combination and conspiracy to force, against their will, all persons, firms or corporations engaged in the manufacture and sale of ladies' garments, * * * including plaintiffs, * * * to organize their employees into an organization to be part and parcel of the defendant union, with the intent thereby to control the employment of labor in and the operation of all said businesses. * * *"

Whatever else the evidence may support certainly it supports these allegations.

Here then is a controversy in which the International seeks to unionize under its banner plaintiff's employees and thereafter to represent them, and in which it is opposed by plaintiff and intervener.

The petition charges and the evidence disclosed that the International instituted and carried on controversies like to its controversy with plaintiff with three other manufacturers in Kansas City engaged in the same line of business as plaintiff. They were the Missouri Garment Company, the Gernes Garment Company, the Gordon Brothers Manufacturing Company. Plaintiff and intervener presented these controversies to the court in great detail in pleadings and evidence, most vividly presented them so that the court could see the true nature of the controversy between the International and plaintiff. It was proved that in the case of each of the last-mentioned companies the International demanded that the employer cause or permit employees to unionize under the International and then negotiate and contract with the International. In each case the employer refused. Against each of these employers a campaign was then begun, of slander and intimidation. Pickets were stationed outside each of the plants in question. They marched up and down carrying placards asserting the employer was unfair. Loyal employees were urged not to work by the pickets and by other members of the International and of other unions. The employers called upon the authorities for aid.

Moving pictures were exhibited in court. Many scenes were shown of crowds of workmen belonging to the International and their supporters from other unions before the entrances of factories, of pickets marching, of police lines formed across sidewalks before factory entrances, of employees arriving by automobiles and endeavoring to pass through the police lines into factories, of struggles between these two opposing forces with police gently interfering.

It was proved to the court by plaintiff that in these controversies the International won. In each case the employer at last capitulated. His employees were organized

under the International. The employer entered into a contract with the International. Then peace was restored and work began again.

These controversies were presented to the court as examples in the eye, if we may use the phrase of the old writers, of what was and is threatened against plaintiff.

Plaintiff and intervener say that such a controversy is not a labor dispute within the meaning of the law. Let us then examine the law that we may know what the law declares a "labor dispute" to be, that then we may test the controversy here by that definition.

### Background of the Act

The Norris-LaGuardia Act referred to is one of those which best can be understood in the light of its background. Prominent in the background is the Clayton Act, 38 Stat. 730 et seq., section 20 of which, 29 U.S.C.A. § 52, provides that "No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney."

Here, in the words, "involving, or growing out of, a dispute concerning terms or conditions of employment," was essentially the same language as is in the Norris-LaGuardia Act. That language was construed in Duplex Printing Press Co. v. Deering et al., 254 U.S. 443, 445, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196, the judgment in which case reversed that of the Circuit Court of Appeals for the Second Circuit, 252 F. 722, which affirmed that of the District Court. 247 F. 192. It is desirable that we should have in mind the principal facts of that case.

The facts in the Duplex Case are summarized by the Supreme Court. 254 U.S. 443, loc.cit. 462, 41 S.Ct. 172, 175, 65 L.Ed. 349, 16 A.L.R. 196. The International Association of Machinists, although not a par-

ty, combined with others, including the parties, to compel the Duplex Company to unionize its factory. The end aimed at was sought to be accomplished "by means of interfering with and restraining [the company's] interstate trade." None of the defendants ever was an employee of the company, nor did the company have or had it ever had relations with the International Association or any of its locals.

The injunction prayed was denied by the District Court and by the Circuit Court of Appeals. Two of the three judges of the Circuit Court of Appeals (Judges Hough and Learned Hand), as one of the grounds for their conclusion that an injunction should not go, were of the opinion that the case was one "between employers and employees" within the meaning of section 20 of the Clayton Act, 29 U.S.C.A. § 52. Judge Hough said, 252 F. 722, loc.cit. 748: "The words 'employers and employés' as ordinarily used, and used in this statute, * * * must refer to the business class or clan to which the parties litigant respectively belong." Judge Hand said: "I do not think that the section applies only when the employer is plaintiff and his present or former employés are the defendants." 252 F. 722, loc.cit. 748. The dissenter (Rogers, Circuit Judge) took the position that the statute referred to persons in the immediate and proximate relationship of employer and employee. 252 F. 722, loc.cit. 744.

In the Supreme Court the position of Judge Rogers was approved by the majority. The court said: "Full and fair effect will be given to every word [of section 20] if the exceptional privilege be confined—as the natural meaning of the words confines it—to those who are proximately and substantially concerned as parties to an actual dispute respecting the terms or conditions of their own employment, past, present, or prospective." 254 U.S. 443, 471, 41 S.Ct. 172, 178, 65 L.Ed. 349, 16 A.L.R. 196. Three of the justices dissented in an opinion written by Mr. Justice Brandeis. The minority said: "Congress did not restrict the provision to employers and working-men in their employ. By including 'employers and employees' and 'persons employed and persons seeking employment' it showed that it was not aiming merely at a legal relationship between a specific employer and his employees." 254 U.S. 443, 487, 41 S.Ct. 172, 184, 65 L.Ed. 349, 16 A. L.R. 196.

### Reports of Committees

This history gives clear significance to the report of the House Committee on the Judiciary submitting the Norris-LaGuardia Act. Speaking of section 13 of the act, 29 U.S.C.A. § 113, containing definitions, including a definition of "labor disputes," the report said: "These definitions include * * * a definition of a person participating in a labor dispute which is broad enough to include others than the immediate disputants and thereby corrects the law as announced in the case of Duplex Printing Press Co. v. Deering wherein the Supreme Court reversed the Circuit Court of Appeals and held that the inhibition of section 20 of the Clayton Act [29 U.S.C.A. § 52], only related to those occupying the position of employer or employee and no others." It gives significance also to the report of the Senate Committee on the Judiciary. It is said in the part of that report devoted to section 13 of the bill (dealing with definitions) that: "The bill undertakes specifically to designate those persons who are entitled to invoke the protection of the procedure required (by the bill) * * * in order that the limitation may not be whittled away by refined definitions of what persons are to be regarded as legitimately involved in labor disputes."

### Frankfurter and Harvard Law School.

But there is more in the background of the Norris-LaGuardia Act than the Clayton Act and the conflicting interpretations of that act. There is more in the background than the reports of committees submitting the measure to the two houses. In that background also is the figure, sinister or saintly (the reader may take his choice), the figure of Professor Frankfurter of the Harvard Law School. From High Olympus, more than once, he has moved the pawns upon the nation's chess board and, it is whispered, on occasion has even sought to check the King. In part it was he who wrote the law. See footnote, "The Labor Injunction," p. 226. Over and over again the committees refer to his book, "The Labor Injunction." Obviously that book was written to promote this law. Whatever else one may think of this Jupiter, certainly it will be believed that he knew what he meant in what he wrote.

Concerning the section dealing with the definition of "labor dispute" (it was section 9, it is now section 13, 29 U.S.C.A. § 113), it is said in this book, p. 215:

"A word may be appropriate concerning the rationale of the general scheme thus proposed, before reviewing the specific activities that, by section 4, are excepted from the reach of an injunction. It is an attempt to recognize frankly that the central problem of the law of industrial relations is to determine the purposes that justify combination of laborers by marking the outposts of the concept of "self interest." How far laborers may combine to strive for concessions that are not of immediate benefit to them but which strengthen the union organization; how far a union in one craft may use its power to achieve the unionization of non-union plants within the same craft; how far a union of one craft may exert its power in aid to unions of another craft, and how dependent one craft must be upon the other to justify co-operative tactics—these and like issues are the crucial ones. Section 9 of the proposed bill settles all of these questions so far as application for equitable relief is concerned. Immunity from injunctions extends to all the categories that we have described, save alone as to persons who are not engaged in the same industry with the complainant. What occupation, craft or trade is within, or outside of, a particular industry is necessarily left for individual decision. The obvious change intended by Section 9 is to extend the area of unrestrainable conduct beyond the limits now recognized by federal decisions. The interpretation given by the Clayton Act by the Duplex Case, to the effect that the privileges of that Act may be invoked only in a dispute between an employer and his employees, is thus rendered innocuous. So much for the meaning of the new proposals.

"As to the merits of this extension of the permissible area of controversy, something has been said already. The economic bond that unites in interest all who earn their livelihood by any of the processes of fabrication and distribution of a single commodity, or of related commodities, or of commodities industrially dependent upon one another, is a relatively recent phenomenon in its significant proportions. Just as conditions of labor in one shop react upon conditions of labor in another shop of the same craft, so conditions of labor in the craft as a whole influence labor conditions in other but allied crafts. These are facts to be heeded if there is to be any correspondence between law and life. The meaning of these facts Mr. Justice Brandeis has made luminously clear:

" 'When centralization in the control of business brought its corresponding centralization in the organization of workingmen, new facts had to be appraised. A single employer might, as in this case, threaten the standing of the whole organization and the standards of all its members; and when he did so the union, in order to protect itself, would naturally refuse to work on his materials wherever found. When such a situation was first presented to the courts, judges concluded that the intervention of the purchaser of the materials established an insulation through which the direct relationship of the employer and the workingmen did not penetrate; and the strike against the material was considered a strike against the purchaser by unaffected third parties. * * * But other courts, with better appreciation of the facts of industry, recognized the unity of interest throughout the union, and that, in refusing to work on materials which threatened it, the union was only refusing to aid in destroying itself.'

"Section 9 thus registers the implications of interdependence within American industry. It permits the collaboration of efforts between unions whom substantial interests make natural allies. It withholds immunity from the chancellor's decree at a point where combination aims to include unions that have no economic bond but only a sympathetic interest."

Now we have at least a part of the background of the Norris-LaGuardia Act. And we know it was the purpose of Congress to prohibit outright and altogether injunctions in many labor disputes in which injunctions had been issued and to circumscribe and condition the issuance of injunctions in all labor disputes. And we know, also, that it was the purpose of Congress to so broaden (or, perhaps, to so clarify) the definition of a "labor dispute" as that "the limitation (i. e. upon injunctions) may not be whittled away by refined definitions of what persons are to be regarded as legitimately involved in labor disputes." Most clearly do we understand that it was the purpose of Congress to make it absolutely certain that the concept that a dispute must be between employer and employees was to be removed completely from the definition of a labor dispute.

### The Purpose Accomplished

The purpose of Congress was effected. The elaborate definition of what is a labor dispute in section 13 of the act, 29 U.S.C.A. § 113, is all-inclusive. Set out above is the full text of that section. It is now set out again, but broken up, in column 1. In parallel column 2 are set out the facts of the present case.

| The Statute | The Facts |
| --- | --- |
| **A** | **A** |
| "A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft or occupation; or have direct or indirect interests therein; * *.* | All parties to the present controversy are engaged in the same industry, trade, craft and occupation. |
| whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) * * * or (3) between one or more employees or associations of employees and one or more employees or associations of employees; | The controversy here is between an employer (Donnelly Garment Company) and an association of employees (International) Also it is a controversy —between one association of employees (Donnelly Garment Workers' Union) and another association of employees (International). |
| **B** | **B** |
| or when the case involves any conflicting or competing interests in a "labor dispute" (as hereinafter defined, i. e. any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee) of 'persons participating or interested' therein (as hereinafter defined, i. e. a person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.") | This case involves "conflicting" interests (of plaintiff, intervener, and International) in a controversy concerning terms of conditions of employment (e. g. the International contends the plaintiff denies the plaintiff is in a class of manufacturing in which higher wages are paid). The controversy is also one concerning the "association and representation" of plaintiff's employees (The International demanding and intervener resisting the demand that plaintiff's employees be unionized under plaintiff and then be represented by plaintiff). The International is such a person since relief is sought against it and it (i. e., its members) are engaged in the same industry, etc. as plaintiff and intervener (i. e., its members). |

It will be observed that the definition of a "case involving or growing out of a labor dispute" is divided here in two parts, A and B. Each is separate and distinct from the other. Probably it is necessarily implied in part A that the dispute there spoken of shall not be wholly unrelated to the business of the industry. There is, however, nothing expressly indicating that the dispute must concern some particular and restricted subject such as those described in paragraph (c) of section 13, 29 U.S.C.A. § 113(c). In part A the emphasis is upon the disputants and not at all upon the subject of the dispute. Thus a case involving two labor unions (associations of employees) is declared to be a case involving or growing out of a labor dispute, without reference to the *casus belli*.

It is quite clear indeed that the controversy need not presently involve a labor dispute at all. The language of the statute is, "involving or growing out of a labor dispute." 29 U.S.C.A. § 107. A distinction is intended between a case involving a labor dispute and a case growing out of a labor dispute. That distinction may be illustrated out of the record in this case. Members of the International employed by the plaintiff were separated, temporarily at least, from the pay roll. A controversy concerning that matter between the International and the plaintiff certainly would have "involved" a labor dispute. But the incident in question happened several years ago. The employees who were dropped are not seeking work now in plaintiff's factory. That dispute ended favorably to plaintiff. Is it inconceivable that antagonisms developed in that dispute from which came a resolution on the part of the International to unionize plaintiff's employees? The International sets about to accomplish that result. Its efforts are opposed by plaintiff. That is a controversy. Does not that controversy "grow out of" a labor dispute?

Returning now to part A of the definition and to the facts of this case set up in a parallel column, it will be seen that the facts fit the definition as the hand fits the glove. They still do that if we add to the definition a requirement that the controversy (if it is to be held to grow out of or involve a labor dispute) must concern terms and conditions of employment or the organization and representations of employees.

And if we consider part B of the definition and the facts set up in parallel column (and parts A and B are independent of each other, if we have a controversy growing out of or involving a labor dispute according to the definition in either part A or part B, that is sufficient), once more the facts fit the definition as the hand fits the glove.

It would seem that nothing could more completely be demonstrated than that what we have here either grows out of or involves a labor dispute within the statutory definition. What is as obvious as the sun at noonday shining in an unclouded sky ought not to require further demonstration than to say, "there it is." Only the facts that my associates, plaintiff's and intervener's learned and distinguished counsel, and one Circuit Court of Appeals, have denied what seems obvious to me justify further discussion of the matter.

### Cases from Seventh Circuit

The case chiefly relied upon is that decided by the Seventh Circuit Court of Appeals, October 26, 1935, United Electric Coal Companies v. Rice et al., 80 F.2d 1, 5. In that case the District Judge had refused to issue an injunction solely because he deemed the case involved or grew out of a labor dispute. His action was reversed by the Circuit Court of Appeals.

The ground for the conclusion reached by the Circuit Court of Appeals in which we are now interested (two other grounds also are set out by the court) was thus stated:

"The term 'labor disputes' comprehends disputes growing out of labor relations. It infers employment—implies the existence of the relation of employer and employee. * * *

"Equally clear we think must be the conclusion that the dispute referred to in the statute must be one between the employer and the employee or growing directly out of their relationship. It does not apply to disputes between employees or to disputes between employee unions to which employer is not a real party. The employer is not precluded from invoking the jurisdiction of a Federal court of equity unless it appears that it was in some way a party to the dispute, between two unions. * * *

"The entire Act had reference to controversies over wages and conditions of employment which arise between employer and employee and result in strikes or threatened strikes which work hardships upon the innocent third party—the public.

"In seeking to avoid strikes, it was to be expected that arbitration would be encouraged and resort to court proceeding discouraged. It is quite apparent that the employer has nothing to arbitrate and no use for conciliators when it and its employees are in accord. It is hard to see what sort of arbitration or conciliation was intended if the legislation referred to anything other than to strained or striking relationships between employer and employee over wages and conditions of employment. Where the difference is between two unions, each striving to contract with the employer, and there is no controversy as to terms of employment with said employer, we are unable to see where any labor dispute exists to which the employer is a party. * * *

"Subsection (c) of section 113, 29 U.S. C.A. defines labor dispute as follows:

"'(c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.'

"There was no controversy between appellant and appellees on any subject. Appellant's employees could join any union they wished. They could change membership in one union for that of another. They could quit work, individually or collectively. But they cannot assert they have a controversy with appellant because of the existence or exercise of such rights. They could not, with no controversy with appellant at stake, change membership in unions and then demand of appellant that it break a valid contract which it had with another union and call it a controversy."

Now it was found as a fact that in the case the only controversy was that between two unions. A contract had been made between the employer and the union then representing its employees. Certain of these employees had withdrawn from the union and entered into or formed another. The second union was now demanding that the employer break its contract with union No. 1 and contract with it. No difference existed between the employer and any of its employees touching wages or any term or condition of employment. "The contest" was between the unions for membership and the control of laborers was "extremely bitter." The mines were closed by picket lines. Peace officers were unwilling or unable to handle the situation. The injunction was then asked.

Here then was what the Circuit Court of Appeals itself characterized as an "extremely bitter contest" between two unions (associations of employees) "for membership and the control of laborers" in a particular mine. In view of the definition of what is a labor dispute (which includes a case involving "persons engaged in the same industry * * * whether such dispute is * * * between one * * * association of employees and [another] * * * association of employees"), the conclusion of the Circuit Court of Appeals that the "extremely bitter contest" was not a labor dispute must be taken only as meaning that it was not a labor dispute to which the employer was a party.

The theory of the opinion of the Circuit Court of Appeals seems to be that, although a labor dispute is involved, if the party asking an injunction is not himself one of the disputants, the restrictions of the act do not apply to him. But that theory is inconsistent with the express language of the act which prohibits an injunction "in any case involving or growing out of a labor dispute." 29 U.S.C.A. § 107. There was certainly a labor dispute ("a bitter contest") between two unions in the case before the Circuit Court of Appeals. The picketing and violence which injured the complainant resulted directly from that contest. The case then, even if it did not immediately involve a labor dispute, certainly was a case "growing out of a labor dispute."

Again it appears to be the theory of the Circuit Court of Appeals, and it is said in so many words, that a labor dispute "must be one between the employer and the employee or growing directly out of their relationship." This assertion is made in the face of the express provision of the statute that a labor dispute may exist "whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C.A. § 113(c). It is made in the face of the history of the act, from which it appears clearly that one of the chief purposes of Congress was to avoid just such a narrowness of definition.

Still again it appears to be the theory of the Circuit Court of Appeals not only that there must be some kind of a controversy between him seeking injunctive relief and him or them against whom it is

sought (which undoubtedly is true), but also that that controversy must be a particular kind of a controversy (the act does not say so), to wit, a controversy which the disputants have a right to maintain. Said the court, the employees "could not * * * change membership in unions and then demand of [the employer] that it break a valid contract which it had with another union and call it a controversy."

Nothing in the act justifies any such conclusion. Nothing in the meaning of the word "controversy" justifies any such conclusion. A controversy, in the broad sense (and the word is so used here), is any sort of "difference" or "dispute" or "strife." Even in the narrower legal meaning of the word a "controversy" is any justiciable dispute in civil matters. Whether the word is used broadly or narrowly, the existence of a controversy cannot possibly depend on the right or wrong of the conflicting contentions of the parties.

### Lauf v. Shinner & Co.

The Circuit Court of Appeals for the Seventh Circuit decided also the case of Lauf v. Shinner & Co., 82 F.2d 68, 72. In that case the court interpreted its earlier decision in United Electric Coal Companies v. Rice, pointing out that that decision was bottomed on the conclusion "that the labor dispute designated in the Norris-LaGuardia Act referred to a labor dispute between the employer and the employee and did not apply to disputes between employees or to disputes between employee unions to which the employer was not a real party," and it pointed out that in that case the "employer was in no manner involved, except that it was suffering enormous damage without fault on its part. Both unions were satisfied with wages, hours, and conditions, and the strike was called merely because the employer would not cancel its contract with the United, and enter into a like contract with the Progressives."

In the Lauf Case, the facts are closer in one respect to the facts in the case before this court than was the United Electric Coal Companies Case. In the Lauf Case, not one of the employees of Shinner & Company were members of the union against which injunctive relief was sought. The court said that: "Neither the employer nor any of his employees are engaged or involved in a labor dispute with anyone. The controversy, rather, seems to be a unilateral one with the sole object of coercing appellee [Shinner & Company] to compel its employees to join the appellant union, in order that it may represent the employees in their dealings with the employer. Appellants seek to accomplish that result by picketing and damaging the employer's business." The conclusion reached by the court that the Norris-LaGuardia Act did not condition the issuance of an injunction in such a case was bottomed entirely on the law as declared in the United Electric Coal Companies Case, to wit, that there cannot be a labor dispute within the meaning of the Norris-LaGuardia Act unless there is a dispute "between the employer and the employee." Nothing is added in support of this conclusion to what was said in United Electric Coal Companies v. Rice. Although it is said (it does not bear upon the definition of labor dispute) that the employer's "right to carry on business—be it called liberty or property—has value, and he who interferes with the right without cause renders himself liable," the suggestion is that a demand made without cause of an employer by a labor union or a demand with which the employer cannot comply without violating some provision of the law is not within the public policy of the Norris LaGuardia Act and, therefore, not within the meaning of the phrase "a labor dispute," as defined in that act.

Concerning the conclusion that the term "labor dispute" is restricted to a dispute between an employer and his employees, I have said all that I have to say. The further conclusion that either the definition of a labor dispute should be restricted to a dispute in which each of the disputants, e. g., the labor union, is demanding from the other something that it has a right to demand and that the other has a right to grant, or that the prohibition against the issuance of an injunction except as conditioned by the act is impliedly modified so as to authorize an injunction without compliance with the conditions of the act in a case in which the demand made by a labor union is a demand it does not have a right to make or one which the employer can not lawfully grant, is to be considered.

It is not pretended that the conclusion just stated is based upon any express language of the Norris-LaGuardia Act, for it is not. If it is supported by the act at all, it is supported by implication. Certainly, any implied provision in an act may be made an express one. Is it to be understood then that it is the opinion of the Court of Appeals that the Norris-LaGuardia Act is

to be read as if section 1 of the act, 29 U.S.C.A. § 101, were thus written: "No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter: Provided, however, that the prohibitions of this section shall not apply in a case in which employees, or an association of employees are demanding of an employer what they do not have a legal right to demand or what he does not have a legal right to grant?"

Or is it to be understood that the section, section 13, 29 U.S.C.A. § 113, defining a case which shall be held to involve or grow out of a labor dispute, is to be read as if it was written as follows: "The term labor dispute includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee: Provided, however, that if the controversy is one in which employees, or an associaton of employees demands of an employer what it does not have a legal right to demand or what the employer does not have a legal right to grant, the controversy shall not be a labor dispute?"

What the Seventh Circuit Court of Appeals says necessarily is implied in the act is thus put in express language. The result is almost ludicrous. That Congress intended to close every possible avenue of evasion of its purpose to prevent injunctions in labor disputes must be apparent to any one who reads the act and considers its background. How inconceivable it is that Congress, with such an intent, would itself have pointed to an easy way for the circumvention of that intent. To the judges is to be left the absolute discretion (that is, to the federal judiciary, including the trial judges and the appellate judges) of setting aside the act whenever in their opinion employees or labor unions are demanding what they do not have a right to demand or demanding that which the employer does not have the right to grant. That the Congress put into the act by implication (or would have put into it in express language) such a self-destructive provision is to assume that the act was not written in the interest and at the dictation of the labor organizations of the country, when the contrary is written all over the act and in every provision of it.

### Bearing of Public Policy on Definition

My learned colleagues believe that the express and positive language of section 13, 29 U.S.C.A. § 113, defining what Congress meant by a "case involving or growing out of a labor dispute," must yield to what they conceive are the implications of another section of the act, that is, of section 2, 29 U.S.C.A. § 102, dealing with the "public policy of the United States in labor matters." They say: "The definitions of labor disputes embraced in section 113 [i. e. section 13, as enacted] of 29 U.S.C.A. must * * * be confined to cases which involve and concern such exercise of freedom of action on the part of employees with which the declared public policy deals." Particularly do they rely, as they point out clearly, upon the following from section 2: "It is necessary that he [i.e., the invididual unorganized worker] have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

Here in section 2 is a declaration that it is the public policy of the United States that workers "shall be free from the interference, restraint, or coercion of employers of labor" to the end that they shall "have full freedom of association, self-organization, and designation of representatives of [their] own choosing." And the whole act concerns itself with preventing or handicapping one method of "interference, restraint, or coercion of employers," i. e., by obtaining injunctions. The whole act is an exemplification of the public policy declared. How do my colleagues derive from the public policy so declared a limitation of the later definition of "a case involving or growing out of a labor dispute?"

First of all, they immediately amplify, as it seems to me, section 2, saying: "Interference and coercion on the part of employers is prohibited; and, if the employee is to be assured of actual liberty of contract, and freedom of association, coercion

from any source must likewise be prohibited."

The conclusion is that interference with employees by an outside union is against public policy. But is that conclusion not perhaps unwarranted? The public policy of the United States, as declared by Congress, is against interference with workingmen by employers of labor only. It does not seem to me the court may first expand the declared public policy and then upon the expanded declaration build a limitation of an otherwise unlimited definition.

There is another answer to this argument. The public policy of the United States, even when declared expressly in a statute, is never of the substance of the statute. It is valuable only in interpretation; to be used only when something requires interpretation. That, I think, is elementary. If we have an ambiguous provision in a statute, a provision which will support two meanings, then we may resort to the declaration of public policy in the act, if thence some indication of the meaning intended may be derived. It was that rule which the Supreme Court had in mind when in Virginian Railway Co. v. System Federation, 300 U.S. 515, 563, 57 S.Ct. 592, 607, 81 L.Ed. 789, it said that certain "strained and unnatural constructions" of the Norris-LaGuardia Act conflicted "with its declared purpose."

With great respect I suggest my colleagues first should point out some ambiguity in section 13, dealing with definitions, before appealing to section 2, dealing with public policy. If it is possible to find in section 13, in its definition of a case "involving or growing out of a labor dispute," as one meaning, that it must be a controversy between an employer and his employees (in face of the express and positive declaration to the contrary), then section 2 may be appealed to as supporting that meaning, if it does support that meaning. But it will be very difficult (impossible, I think) to discover any such meaning in section 13.

### Bona Fides in Labor Disputes

It seems to me my colleagues possibly again err in suggesting that the sort of "labor dispute" intended by the Norris-LaGuardia Act is a "bona fide dispute as to wages, hours, terms and conditions of employment." The act expressly provides that a dispute may concern other things than these. Moreover, if my colleagues mean by the use of the word "bona fides" in this connection that the dispute must be between disputants occupying the proximate relation of employers and employees, that is directly denied by the very words of the act. Perhaps they have in mind a contention of plaintiff's counsel.

It was the contention of counsel for plaintiff that every element in the controversy between the International and plaintiff as it was described in the letter addressed to the plaintiff by the International and set out, for the first time, in the amended bill, and as shown by the evidence, was false and fraudulent. The weight of the evidence we have heard supports the conclusion that the contentions made by the International are not founded in the facts. But that is not to say that those contentions, or some of them, were not made in good faith. If we assume, however, that every essential element of a labor dispute is present, does it cease to be a labor dispute if the demand made by one disputant of others is not made in good faith? Are courts authorized to decide upon affidavits whether there is present in the case a bona fide labor dispute and, deciding that there is none, to issue an injunction without requiring compliance with the conditions of the act? To say so is to emasculate the act. Not a word in the act justifies any such conclusion. It would be as reasonable to say that the Constitution does not guarantee a jury trial to a party whose contentions in a case are not made in good faith.

Finally, while I agree that the weight of the evidence is against the International as to every one of its contentions with the plaintiff, I am not willing to say that its officers and agents and counsel are so devoid of all decency as that there is not some measure of sincerity in some of their contentions. Nor do I suggest or think that my colleagues entertain that opinion.

### Effect of National Labor Relations Act

2. To this point I have considered the Norris-LaGuardia Act and its effect upon the case before us entirely without regard to the later National Labor Relations Act, sections 151–166, Title 29 U.S.C.A., 29 U.S.C.A. §§ 151–166. Plaintiff and intervener advance the contention that the definition of "labor dispute" in the Norris-LaGuardia Act impliedly is modified by the later act. The argument supporting the contention is this: The Labor Relations Act, § 7, 29 U.S.C.A. § 157 authorizes "employees * * * to bargain collectively through representatives of their own choosing," and provides, section 9, 29 U.S.C.A. § 159, that: "Repre-

sentatives designated or selected for the purposes of collective bargaining by the majority of the employees * * * shall be the exclusive representatives of all the employees * * * for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." If the employees of a given factory have organized and have selected representatives to bargain collectively for them, the employer is forbidden to bargain with any one else concerning "rates of pay, wages, hours of employment, or other conditions of employment." And the argument continues, if the employer cannot bargain with any one else concerning "rates of pay, wages, hours of employment, or other conditions of employment," he cannot have a controversy or dispute touching such matters with any one else. (The argument is completed by the final contention that plaintiff's employees have organized, have designated representatives to bargain collectively with plaintiff, and that a bargain has been struck, a contract entered into.) From all of this it is concluded that the definition of "labor dispute" in the Norris-LaGuardia Act has been modified so that now that phrase must be defined thus: A labor dispute is a controversy concerning "rates of pay, wages, hours of employment, or other conditions of employment" only if the controversy is between an employer and the representatives selected by the majority of the employees, provided the employees have organized and have selected representatives for collective bargaining.

Among the errors in this argument are these: (1) The Norris-LaGuardia Act and the Labor Relations Act concern entirely different matters, wherefore it is not to be presumed that the latter was intended to repeal or modify the former in any respect, absent an express declaration to that effect. (2) The existence or nonexistence of a dispute does not depend upon where the merits lie nor upon the inability, for legal or other reasons, of one of the parties to comply with the demands of the other. (3) The collective bargaining provided for in the Labor Relations Act is bargaining concerning "rates of pay, wages, hours of employment, or other conditions of employment." It is not a bargaining "concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." But the "labor dispute" defined in the Norris-LaGuardia Act

may be a dispute concerning this last-mentioned matter. Hence the argument of plaintiff, if otherwise sound, has no application to a controversy concerning the "association or representation of employees. (4) The argument precludes the possibility of a "labor dispute," where the employees are organized and have chosen representatives, and so ignores the express definition of what is a "labor dispute," set out in section 2 of the Labor Relations Act, 29 U.S.C.A. § 152, which definition is a repetition almost in hæc verba of that in the Norris-LaGuardia Act.

Subdivision No. 3 of the preceding paragraph profitably may be amplified. While the Labor Relations Act impliedly prohibits an employer bargaining with others than the chosen representatives of a majority of the employees "in respect to rates of pay, wages, hours of employment, or other conditions of employment" (National Labor Board v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 44, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; cf. Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789), most clearly it does not prohibit negotiations between an employer and a national or international union concerning organization of the employer's employees by that union and the ultimate representation of the employees by the union. And that is true whether there is or is not an existing union.

Suppose a national union whose purposes are in good faith to improve the conditions of the working people in a given industry. Suppose a great factory which maintains an "open shop" and into which this national union has not been introduced, in which it has no local. No one will say that the members of the national union may not be vitally interested in the "rates of pay, wages, hours of employment, or other conditions of employment" in that factory, and therefore that they may not be vitally interested in the organization and representation of its employees. The "rates of pay, wages," etc., of the whole industry may be affected by those maintained in this one factory. Suppose now that in this factory is a factory union. Suppose its organization has been inspired by the employer. If the employees really were entirely free to act as they chose, if they did not stand alone but had back of them the great numbers and resources of a national organization, perhaps the factory union never would have been organized. If we make these

suppositions, and none of them is difficult to make, is there not a legitimate field for a controversy between the employer and that national union? Undoubtedly the Norris-LaGuardia Act contains a recognition of that field of controversy and says that a controversy in that field is a "labor dispute." There is nothing to the contrary in the Labor Relations Act.

The International here contends that it is interested in the wages, hours, working conditions throughout the industry. It contends that the operation of one great factory like that of plaintiff as an "open shop" handicaps the International in its ceaseless struggle to better the conditions of its members. It contends that the factory union is employer dominated. It contends that in the long run the best interests of the employee class, including the employees in plaintiff's factory, will be served if a solid front under one command is presented in the so-called industrial struggle. About these things it may be thought to be sincere. Those contentions are made in good faith, however elsewhere there may be camouflage and slander.

### Effect of N.L.R.A. Considered Further

The whole of plaintiff's theory here is that it became unlawful with the adoption of the National Labor Relations Act and with the organization of the factory union for plaintiff to conduct any negotiations whatsoever with the International. If the plaintiff could not lawfully have negotiated with the International it could not have a dispute with it and, therefore, there was no labor dispute. (1) But this theory assumes that the Labor Relations Act impliedly forbids plaintiff negotiating with the International concerning the organization and representation of plaintiff's employees, which it does not do. (2) The theory assumes that the Labor Relations Act forbids negotiations between plaintiff's factory union and the International, which it does not do. (3) The theory assumes that if the law prohibited negotiations between the plaintiff and the International or between the factory union and the International there could not be a dispute between the plaintiff and the International or between the factory union and the International Union, which is plainly a non sequitur. There is a dispute here, the existence of which is admitted. It concerns exactly what it would have concerned had there been no Labor Relations Act. Would it have been a labor dispute before the passage of that act but not after its passage? (4) The theory assumes that Congress did not intend in the combined Norris-LaGuardia and Labor Relations Act that in all cases injunctions against labor unions in contests with other unions or with some employer in the same industry should be preceded by compliance with the conditions laid down in the Norris-LaGuardia Act, if the union against which the injunction was sought is doing that which the law forbids (as dynamiting a factory or inducing some one to break a contract). That assumption is squarely against both the spirit and letter of the law. Indeed, the only injunction which the Norris-LaGuardia Act does allow are those against unlawful acts. Why would Congress protect a labor union from an injunction against dynamiting a factory unless the injunction was obtained as the Norris-LaGuardia Act provides and refuse it protection from an injunction against negotiating peacefully with any employer to raise wages in its factory solely because that employer is forbidden to deal with that union? (5) The theory assumes that the Labor Relations Act, under the circumstances shown here, forbids negotiations between plaintiff and the International touching wages, hours, etc., in plaintiff's factory. It does not do that. It impliedly (and only impliedly) forbids plaintiffs entering into a contract with others than representatives of a majority of its employees. It is rather far-fetched to say that because the employees of a factory are organized and have a spokesman that no one else (the President, Governor, the mayor, the bishop of the diocese, an International Union) can negotiate or quarrel or have a dispute with that employer about wages and hours.

### That a Forum is Provided to Decide a Controversy Does Not Affect Legitimacy of Controversy

But it is said that if there is a controversy here the Labor Relations Act provides for the decision of such a controversy by the Labor Relations Board. Let us assume that that is true. A controversy between the International and the factory union as to which should represent the employees was one which might have been submitted to the Labor Board. It was then a legitimate controversy. Did it cease to be a legitimate controversy, a legitimate dispute, because it was not submitted to the Board? There is nothing in the act which declares expressly or by

implication that the International cannot carry on such a controversy by fomenting a strike, for example, among the employees, or in any other way whatsoever. The mere fact that a forum is provided for the settlement of a particular kind of a dispute certainly cannot be held to mean that if the dispute is not submitted to that forum therefore the dispute cannot exist. Are not courts provided for all kinds of disputes? If disputes are not submitted to the courts, does it follow that there are no disputes? How can the legitimacy of a dispute be affected by the fact that it is or is not submitted to a tribunal which would decide, not the legitimacy of the dispute, but who is right in the dispute?

### "Ex pressio unius," etc.

We know that the Norris-LaGuardia Act was not overlooked when the National Labor Relations Act was drawn; for it is expressly referred to. See section 10(h), 29 U.S.C.A. § 160(h). That reference is most significant. It is an express provision that in one particular, to wit, "when granting appropriate temporary relief or a restraining order, or making and entering a decree enforcing, modifying, and enforcing as so modified or setting aside in whole or in part an order of the Board, as provided in this section [i.e. in section 10], the jurisdiction of courts sitting in equity shall not be limited by sections 101 to 115 of this title" (i.e., by the Norris-LaGuardia Act). The inference is (and such is the effect of the canon of construction, "ex pressio unius," etc.) that this is the only respect in which the Norris-LaGuardia Act has been affected by the passage of the Labor Relations Act.

### Did Congress Change Attitude Toward Labor

No one who reads the Norris-LaGuardia Act, especially if he reads it in the light of its history and background, can have any, doubt whatever but that Congress intended that no injunction should issue except as conditioned in the act in a dispute between a national labor union and an individual employer of labor concerning inter alia the unionization of employees under the national union. Concede now that the National Labor Relations Act provides a forum (the National Labor Relations Board) for the decision of just such a labor dispute as that, but that the union does not elect to submit that dispute to the forum provided and proceeds to lay siege vi et armis to the employer's factory.

What is there in the act, in the act which expressly provides (notwithstanding it provides a forum for the adjustment of labor' disputes) that it shall not "be construed so as to interfere with or impede or diminish in any way the right to strike," section 13, 29 U.S.C.A. § 163, that suggests an intention to diminish in some way a right only recently gained by labor, i. e., a right to freedom from injunctions except when obtained in accordance with stated conditions? The whole course of Congress in the last decade is against such a conclusion.

### Section 8, Norris-LaGuardia Act, 29 U.S.C.A. § 108

It was said at the oral argument by counsel for plaintiff that whereas the Norris-LaGuardia Act provides in section 8, 29 U.S.C.A. § 108, that "No restraining order or injunctive relief shall be granted to any complainant * * * who has failed to make every reasonable effort to settle such dispute [i.e. the labor dispute involved] either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration," the effect of the Labor Relations Act was to make impossible even negotiations (much less settlement) between the plaintiff and the International. From this the conclusion was drawn that the Norris-LaGuardia Act had been pro tanto repealed.

Is this not loose thinking? That the plaintiff and intervener could not conceivably have settled their controversies with the International is untrue. Nothing in the law prevented it. Other Kansas City manufacturers did settle similar controversies with the International. The only thing the Labor Relations Act prohibited was the closing of a collective contract between the plaintiff and the International against the wishes of the representatives of the majority of the plaintiff's employees.

If it is inconceivable that a settlement was possible, what of that? If a settlement is impossible for any reason, if that may be known in advance of an effort to settle, then an effort to settle is not required. In a situation of that kind section 8 would not be construed to require such an effort, the law never requires an entirely or obviously useless thing, and section 8 would constitute no obstacle to the issuance of an injunction.

### Question of Constitutionality

3. The validity of the Norris-LaGuardia Act is challenged in the event it should be

held by the court that we have here a "labor dispute" within the meaning of that act. The challenge is that the Norris-LaGuardia Act is "in contravention of the guarantees of liberty, property and due process (of) * * * the Fifth Amendment * * * and in contravention of * * * Article 3 of the Constitution * * * for the reason that it is a usurpation of the Judicial Branch of Government by the Legislative and Executive Branches. * * *" But there is not much of merit in this challenge. As to that I agree entirely with my colleagues.

The "due process" clause of the Fifth Amendment would not be violated by the repeal of all laws creating the inferior federal courts. Undoubtedly Congress has the power to repeal those laws. If Congress constitutionally can withdraw all jurisdiction whatsoever from the District Courts, a fortiori it can withdraw a part of that jurisdiction. That power it has often exercised, nor has that power seriously been questioned. So, also, no withdrawal of jurisdiction and no reasonable conditioning of the exercise of jurisdiction where it is not withdrawn can violate article 3. It is now too late, for example, to contend that Congress does not have the power to say that only a District Court of three judges can enjoin an order of the Interstate Commerce Commission or decide a case in which the constitutionality of a statute of the United States is involved. It is now too late to say that Congress cannot require that before an injunction may issue a bond and notice must be given. It is too late to say that Congress may not condition the issuance of an injunction, when jurisdiction to issue one at all is left, upon compliance with the seemingly reasonable conditions of the Norris-LaGuardia Act.

### Conclusion

4. Entertaining the views I have sought to express here, I do not believe the temporary injunction now asked should issue. It is true that only the Norris-LaGuardia Act and its prohibition stand in the way. An overwhelming showing justifying an injunction under the law as it was certainly has been made. But the law is not as it was. Congress has seen fit to change the law. Congress has the power to do that. And the judges must apply the law, whether it is good or bad. They have taken a solemn oath that they will do that very thing.