**DONNELLY GARMENT CO. et al. v. DU-BINSKY et al. (SMITH et al., Interveners).**

No. 2924.

District Court, W. D. Missouri, W. D.

Feb. 14, 1944.

James A. Reed, R. J. Ingraham and William S. Hogsett, all of Kansas City, Mo., for plaintiffs.

Frank E. Tyler and Lucian Lane, both of Kansas City, Mo., for interveners.

Charles A. Horsky, of Washington, D. C., Emil Schlesinger, of New York City, and Clifton Langsdale, of Kansas City, Mo. (Covington, Burling, Rublee, Acheson & Shorb, of Washington, D. C., of counsel), for defendants.

NORDBYE, District Judge. (Acting under special assignment to the Western District of Missouri.)

This proceeding and antecedent litigation have had an extended and involved history. Prior decisions of the trial and appellate courts will be found in Donnelly Garment Co. v. International Ladies' G. W. Union, D.C.1937, 20 F.Supp. 767; Id., D.C.1937, 21 F.Supp. 807; International Ladies' G. W. Union v. Donnelly Garment Co., 1938, 304 U.S. 243, 58 S.Ct. 875, 82 L.Ed. 1316; Donnelly Garment Co. v. International Ladies' G. W. Union, D.C.1938, 23 F. Supp. 998; Id., 8 Cir., 1938, 99 F.2d 309; International Ladies' G. W. Union v. Donnelly Garment Co., 8 Cir., 1941, 119 F.2d 892; Id., 8 Cir., 1941, 121 F.2d 561; Donnelly Garment Co. v. International Ladies' G. W. Union, D.C.1941, 47 F.Supp. 61; Donnelly Garment Co. v. Dubinsky, D.C. 1942, 47 F.Supp. 65; Donnelly Garment Co. v. International Ladies' G. W. Union, D.C. 1942, 47 F.Supp. 67.

The plaintiffs and interveners first proceeded under the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note, and jurisdiction against certain resident and non-resident defendants was solely predicated thereon. After a lengthy trial, and on April 27, 1939, the court entered a decree enjoining the defendants from committing certain acts of fraud and violence and from conducting a secondary boycott in furtherance of the defendants' conspiracy to restrain the interstate trade and commerce of the plaintiffs. The Circuit Court of Appeals reversed (119 F.2d 892) solely because the court lacked jurisdiction, and held that a conspiracy embracing a secondary boycott did not constitute a restraint of trade or commerce within the meaning of the Sherman Act. This decision was filed on June 5, 1941. Thereafter, in response to the motion of plaintiffs and interveners, the decision was modified on July 11, 1941 (121 F.2d 561), and the court afforded plaintiffs an opportunity to apply to the trial court for leave to amend to show jurisdiction based on diversity of citizenship, and if leave was granted it would be for the trial court to determine "whether the amendment allowed constitutes the commencement of a new action requiring a complete new trial; whether a new trial must be had in any event upon some or all of the issues under the amended pleadings; whether that court can or should base a decree upon the present record, with or without supplementation; and what decree shall finally be entered." 121 F.2d at page 563.

This Court, on December 10, 1941 (47 F. Supp. 61) permitted plaintiffs and interveners to dismiss as to certain defendants, including the resident defendants and the International Ladies' Garment Workers' Union, leaving as remaining defendants certain non-resident individuals. The Court further granted plaintiffs and interveners leave to file amended complaints invoking jurisdiction as to the remaining non-resident defendants on the grounds of diversity of citizenship, and to proceed substantially on the same basic facts as were set forth in the prior proceeding. However, on September 19, 1942 (47 F.Supp. 65), this Court entered an order requiring a trial de novo to be had, and not, as plaintiffs and interveners moved, a trial upon the evidence taken at the former hearing supplemented by such evidence as either party might offer.

The new trial, therefore, proceeded against twenty-four non-resident defendants, twenty-two of whom are members of the General Executive Board of the International Ladies' Garment Workers' Union (hereinafter referred to as International), and the other two defendants, Frederick F. Umhey and Max D. Danish, are the Executive Secretary of International and the editor of "Justice", the official publication of International, respectively. Defendant Elias Reisberg died on August 18, 1943. Meyer Perlstein was Southwest Regional

Director of International during the times herein mentioned, supervising its affairs in the States of Missouri, Tennessee, Texas, and Minnesota. He became a member of the General Executive Board in May, 1940. It should be noted, however, that all the defendants are sued as individuals and not in their representative capacity.

The plaintiff Donnelly Garment Company is a large manufacturer of women's dresses in Kansas City, Missouri, which are sold under the trade name of "Nelly Don." Its business is nation wide. The plaintiff Donnelly Garment Sales Company is engaged exclusively in the sale and distribution of the dresses manufactured by the Donnelly Garment Company. The interveners are the nine members of the Executive Committee of the Donnelly Garment Workers' Union. They purport to appear on behalf of themselves as union members and on behalf of all other employees similarly situated. This Union has as its membership substantially all of the employees of the Donnelly Garment Company, exclusive of officers, executives, and persons with authority to employ or discharge. For convenience, the two plaintiffs and the interveners will be referred to hereinafter as plaintiffs, except where occasion may require a distinction to be made, in that the rights of all three parties to an injunction are based substantially on the same grounds.

This action grows out of a labor dispute. It is charged that International proposes to unionize the Donnelly Company employees by fraud, violence and secondary boycott. No strike has ever been called at the Donnelly Company factory, but the injunction is sought because of certain acts and threatened acts which, according to plaintiffs' contentions, require the intervention of a court of equity under the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.

A rather complete statement of the pertinent facts and circumstances seems necessary. It is the position of the plaintiffs that a conspiracy exists among these remaining twenty-three defendants, together with other individuals and concerns, to commit certain illegal acts. The conspiracy is claimed to have had its genesis as early as the month of March, 1934, when the General Executive Board of International met in Kansas City in connection with its campaign to organize the Kansas City dress and coat industry and to call a strike in the event a collective agreement

was not forthcoming with peaceful means. Apparently, active steps were taken at the time by International, through its organizers, to organize this industry, and several contracts in factories other than Donnelly's were negotiated and entered into. At or about this time, a membership of some several hundred persons in unions affiliated with International was obtained in Kansas City. In 1936, International opened an office in Kansas City for the specific purpose of organizing the garment factories, and a substantial sum had been appropriated at or about that time for organization purposes. Meyer Perlstein was in charge of the organization campaign. While considerable activity had been carried on and publicity given to the program upon which International had launched in its endeavor to organize the garment industry in Kansas City and elsewhere in the Southwest, it was not until March 9, 1937, that direct steps were taken to launch the campaign to unionize the Donnelly employees. On that date, defendant Perlstein and one Wave Tobin, manager of the Kansas City Board of International, sent a letter to the Donnelly Company presenting certain alleged grievances and asking for a conference. There can be no doubt that at that time an overwhelming majority of the Donnelly Company employees, numbering some 1,200, were entirely satisfied with their working conditions and wages, and only a small minority had professed any interest in the International's organizational activities. The Donnelly factory was a modern, well-lighted, sanitary plant, and the relationship between the employer and employees was congenial and pleasant. There had been no labor trouble, and it is fair to state that the employees, with a very few minor exceptions, were entirely satisfied with the working conditions accorded to them. As will be discussed more fully hereinafter, the letter of March 9, 1937, contained charges which were in part true and in part wholly inaccurate; some were clearly misleading and others wilfully false and fraudulent. No answer was received by International from the Donnelly Company in response to this letter. Apparently, it was simply ignored. In June, 1937, Perlstein published a full page advertisement in Kansas City announcing that approximately $100,000 had been appropriated for the purpose of organizing the Donnelly employees.

In the Spring of 1937, International called strikes at three other garment plants

located in Kansas City, namely, Gernes Garment Company, Gordon Brothers Manufacturing Company, and Missouri Garment Company. Pickets were placed around the entrances to those plants and violence broke out on several occasions. The employees who tried to pass through the picket lines were beaten, cursed and intimidated by the union strikers and their sympathizers. The police afforded scant protection. Wave Tobin was in charge of the pickets. That she knew of the violence, condoned it, and apparently approved of the methods used by the strikers is not subject to much doubt. During the period when these strikes were going on, a sit-down strike took place in one of the plants and the strikers remained in the entrance to the building where the factory was located continuously for a period of some sixty hours.

It is the plaintiffs' contention that all of this violence was not only condoned and ratified by the Executive Board of International and the other defendants, but that Meyer Perlstein was carrying on a campaign of violence and intimidation in pursuance of a conspiracy among these defendants and others, not only in Kansas City, but in other cities, such as Memphis, St. Louis, and Dallas, where strikes had been in progress prior to the time that they took place in Kansas City. The Dallas and St. Louis strikes took place in 1935, and the Memphis strike in 1937. It is contended that the methods employed in coercing the employers to enter into collective bargaining contracts with International assumed the same pattern of violence, intimidation, and illegal acts, and that it was all a part of the conspiracy of these defendants and others to organize the garment trade in the Southwest area through such methods. During the time that the other strikes were being conducted in Kansas City in the Spring of 1937, it appears that threats were made by certain unnamed pickets and Wave Tobin to the effect that similar tactics and violence as used in these strikes would be employed against the Donnelly Company when a

strike was called at that plant. It should be noted that, at or about this time, that is, in June, 1937, the Donnelly Garment Workers' Union was organized, and substantially all of the employees of the Donnelly Company, other than executives, became members. To all intent and purposes, the Union thus formed constituted a closed shop in the Donnelly factory.

At various times during the year 1937, International, through its representatives, gave considerable publicity to the campaign that was to be directed against the Donnelly Company. It was stated on numerous occasions that the Donnelly Company would have to succumb to the Union's demands and enter into a contract with the Union or cease doing business; that some employees had already joined the Union and that when a sufficient number had been obtained, a strike would be called; and that no money or time would be spared in order to bring the Donnelly Company to terms. Briefly, therefore, it may be stated that it is the position of these plaintiffs that a strike being threatened against them and the Donnelly Company being included within the orbit of the conspiracy, the same pattern of violence, intimidation and illegal methods will be used in the activities of the International's representatives and these defendants in carrying out the plan to bring about a contract between the plaintiffs and the International.

As a part of the same conspiracy, it is contended that certain fraudulent circulars and information were disseminated in order to alienate the Donnelly customers and the public and to prejudice them against the Donnelly Company so that they would not patronize the company, and that it was schemed that the results of the fraudulent acts would be so detrimental that the Donnelly Company would have to bow to the Union's demands. These charges of fraud are based primarily on the dissemination of a circular issued in 1937 entitled "We Do Not Patronize the 'Nelly Don' Dress."[1] This circular contains a copy of the letter of March 9, 1937, which was written by Perlstein and Tobin to the Donnelly Com-

1 "To The Consuming Public:

"The Donnelly Garment Company of Kansas City, Missouri, producers of the 'Nelly Don' dress, are on the unfair list of organized labor. Therefore, we appeal to the consuming public to Help Us By Not Buying, And By Not Offering For Sale 'Nelly Don' Dresses until we establish in the shop of the Donnelly Garment Company the rights and privileges, wage scales, and hours of work that prevail in every shop in the dress industry throughout the country.

"The workers of the Donnelly Garment Company are compelled to work long hours while their wage scale is far below that which prevails everywhere else in the dress industry. The speed-

pany. Undoubtedly, the circular was distributed very generally over the trade territory where the dresses of the plaintiff company were sold. It was placed in the hands of the emissaries hired by International, who called upon many customers of the plaintiffs in various parts of the United States, and these emissaries endeavored to persuade these customers to cease handling Nelly Don dresses, and the contents of the circular, together with other representations, were made use of as a basis for the suggested cessation of business dealings with the plaintiffs. This circular, together with other alleged illegal acts perpetrated by International, its officers, and certain resident defendants including Wave Tobin, was the subject of an application for an injunction which came before a three-judge court. In a decision filed December

up system is such that most of the 1300 workers employed by this firm are in a state of exhaustion and fatigue. Many of them must have constant medical attention because of the nervous strain imposed upon them by this system. Numerous workers suffer complete nervous breakdowns.

"On the next page of this booklet we reproduce a copy of a letter which was sent to the Donnelly Garment Company. The firm has not replied to this letter, but has instead, organized a company union which has been named the 'Donnelly Garment Workers' Union.' The Company has also more firmly entrenched in their shop the Spy System which they established long ago. The Spy System is under the direct supervision of a notorious strike-breaking detective agency, through which every worker is spied upon. Those who dare to complain of conditions, or join a labor organization, or express a favorable opinion of a union, are immediately discharged.

"We appeal to you to help us establish in this shop, conditions and wages that befit civilized human beings. We Appeal To You Not To Purchase The 'Nelly Don' Dress.

"Kansas City Joint Board,
"International Ladies' Garment Workers' Union
"Executive Office:
"1022 Baltimore Avenue,
"Kansas City, Missouri."

"March 9, 1937.
"Donnelly Garment Company
"1828 Walnut Street
"Kansas City, Missouri

"Gentlemen:

"The Kansas City members of the International Ladies' Garment Workers' Union feel compelled to place before you the following grievances that should be adjusted immediately.

"Fifteen members of our Union were discharged by your firm because of their affiliations with our organization. Their case was up before the National Labor Relations Board. During the period the hearings took place the NRA was declared unconstitutional by the Supreme Court of the United States and the Government could proceed no further. The discharged workers have not as yet been returned to work by your firm.

"The Dress Industry, in which your firm is engaged, is highly unionized throughout the country. Nearly every producer of dresses is in contractual relations with our Union. The 150,000 Union workers employed in this industry are enjoying a 5 day, 35 hour working week and a $22.05 per week minimum wage scale for operators, and reasonable, fair minimum scales for finishers, pressers, cutters, et cetera. Piece workers, who compose the majority of workers in your shop as well as in the industry, are enjoying the right, through committees selected by them, of having an equal voice with the management in each shop in determining the piece rates for each garment or operation on a garment.

"The workers in most of the industry enjoy the freedom and rights of organization. Collective bargaining has been established as a permanent institution. These are the conditions and wage scales in the organized industry.

"However, in your shop the minimum wage scale for operators is between $12.-50 and $15.00 per week.

"The wage scales for finishers, pressers and cutters are at least 30 per cent lower than those that exist in the industry.

"The hours of work in your shop are 40 and more per week.

"Your workers are denied the right of joining a labor organization, and those who do, are immediately discharged. Your workers are denied the privileges of genuine collective bargaining. The piece workers in your shop have no voice as to what the piece rates should be as they are set exclusively by representatives of your firm.

"The conditions and wages under which your employees are working not only deprive them of the privileges and opportunities enjoyed by the workers in this industry, but endanger their general work standards and wage scales. Your firm has undue and unjustified advantages over your competitors. The Union believes in 'Fair Competition,' but it does

31, 1937 (21 F.Supp. 807), a temporary injunction was granted. While the decision was subsequently vacated by the Supreme Court on May 16, 1938 (304 U.S. 243, 58 S.Ct. 875, 82 L.Ed. 1316), because of failure of jurisdiction, it is the position of the defendants that this circular was recalled and abandoned in compliance with the provisions of the temporary injunction and was never knowingly distributed or circulated thereafter. A second circular was prepared in 1938, but its contents are not characterized as fraudulent by the plaintiffs.

The so-called secondary boycott, which is the third basis for equitable relief, pertains to the circularization and dissemination of information to the public and to Donnelly's customers regarding the difficulties between the International and the plaintiffs. The carrying out of this type of so-called boycott consisted of the distribution of the circular issued in March, 1937, and the one issued in 1938, supplemented by alleged threats to boycott the stores which handled Nelly Don dresses. In disseminating information with reference to the labor difficulties or disputes between International and the Donnelly factory, it is contended by the plaintiffs that picketing of stores handling the Donnelly product will take place to the irreparable injury and damage to the business of the Donnelly Company. Emphasis is placed on certain threats made by emissaries of International in 1937 and 1938 regarding the boycotting of stores which would not cease handling Nelly Don dresses, and reference is also made to certain articles appearing in "Justice" concerning the contemplated boycott of allegedly recalcitrant store owners who would not comply with the Union's request that they should abandon the sale of the products of the Donnelly factory. The conspiracy and the alleged illegal activities, which are sought to be restrained, will be discussed in the order referred to above.

## Violence

■ That there was an agreement and concert of action on the part of these defendants as officers and representatives of International to unionize the garment industry in Kansas City is, of course, conceded. The right of International to take steps to unionize the employees of the Donnelly Company, even though not a single member of the employees had membership, or cared for membership in the Union, likewise cannot be questioned. A labor dispute existed under the Norris-LaGuardia Act. Lauf v. E. G. Shinner Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872. Presumably, if these defendants, as members of the General Executive Board and representatives of International, committed a tort, they would be liable as individuals as well as officers of the organization which directed their activities. The question, therefore, is whether these defendants, together with other individuals and concerns, entered into a conspiracy to unionize the

not consider competition fair when it is gained solely at the expense of the workers.

"Under your system of production, workers are compelled to invest extraordinary effort, but the reward that follows is very meager in proportion to the efforts invested. Under modern methods of production such treatment of workers is not only wrong from the humane point of view, but also destructive from the economical point of view. In comparison with other shops in the industry which produce the same type of garment the production in your shop is about 30 per cent higher while the earnings of the workers are about 30 per cent lower.

"We, therefore, believe that a conference between our Union and your firm, for an adjustment of these grievances, should take place immediately. The Union has named a committee which stands ready to meet a similar committee named by your firm.

"May we respectfully request that you advise us before the end of this week as to when and where it would be convenient for you to meet our Conference Committee.

"Our aim is industrial peace. We believe in intelligent cooperation between employer and employee. Such cooperation is essential for the welfare of all factors in industry, including the consuming public and community at large. Peace and harmony prevail in the major part of the Dress Industry and we are eager to extend this cooperation to include your firm. Let us join hands to avoid industrial conflict.

"Respectfully yours,
"Kansas City Joint Board
"International Ladies' Garment Workers' Union
"By Wave Tobin, Manager.
"Approved by: Meyer Perlstein, Regional Director,
International Ladies' Garment Workers' Union."

594

entire garment industry in Dallas, Memphis and Kansas City (including the Donnelly Company), and that such unionization, in the event it could not be brought about by peaceful and legal means, would be accomplished by violence, fraud, and secondary boycott.

■ It is common knowledge that violence is not infrequent in many labor disputes where picket lines are established and the non-striking employees endeavor to continue to work. On occasions, clashes between pickets and non-striking employees may be attributable to causes over which the strikers have no control. At other times, the pickets themselves may be the aggressors and entirely to blame. However, one cannot fairly read the record pertaining to the Dallas, Memphis and Kansas City strikes called by International during the period referred to without concluding that the strikers deliberately carried on violence to a shameful extent. True, the violence and illegal acts may not have been deliberately planned at the inception of the strike, and the strikers may not have been instructed to use such tactics by anyone in authority in International. Moreover, there may have been times when the violence was the inevitable result of mass picketing, which in and of itself may not violate the law. But that the strikers were the instigators of violence on frequent occasions cannot be gainsaid. The employees who wanted to work were beaten and their dresses were torn. They were disgracefully treated. In Kansas City, the police failed to handle the situation adequately. It may be noted that the only defendant present during the strikes referred to was the defendant Perlstein. All of the other defendants resided in States other than those where the strikes occurred. They were never at the actual scenes where the strikes were in progress. Their knowledge of what occurred was obtained from the reports of Perlstein and others, articles in "Justice", and general information regarding the progress of the strikes in which they were interested, as representatives and board members of International. The defendant Dubinsky, President of International, had read the decision in the three-judge case handed down in December, 1937, which recited in detail the violence alleged to have occurred at the places mentioned. That Perlstein knew of and condoned the violence is evident. It is inconceivable that these strikes could have been carried on without his tacit approval of the illegal methods which were employed by the strikers. The same observation may be made with reference to Wave Tobin. International paid the fines imposed upon the strikers, hired lawyers when it became necessary to defend the strikers who were charged with various types of breaches of the peace, and the record is barren of any evidence which would indicate that the methods used by the strikers were ever criticized or disapproved by any of these defendants. Certainly, it is most probable that the defendants knew that there was violence breaking out in these strikes. They knew, that, during the Dallas strike, Perlstein served a short time in jail for contempt of court by reason of the violation of the injunction issued in connection with one of the strikes which International authorized and which Perlstein was conducting. The strike at Dallas in 1935, with its unenviable history of mistreatment of employees who merely desired to continue their employment, was heralded by International as one of the strikes which would occupy a place of honor in its annals. Moreover, they knew of the sit-down strike in Kansas City. Much space might be used in reciting the specific acts of violence and other circumstances which occurred in the strikes referred to, and the severest condemnation of the tactics approved or condoned by Perlstein and Tobin is entirely justified.

■ But the instant proceeding is based on an alleged present conspiracy existing among these non-resident defendants, and plaintiffs seek to restrain these defendants as individuals from committing, or directing or encouraging others to commit, acts of violence against them primarily based on events that took place from six to eight years ago. The passage of time in itself is an important factor in construing the events which took place and giving to such events a proper evaluation with respect to a present alleged conspiracy. It must be remembered that no violence has ever been perpetrated on any of the Donnelly employees or officials. No property of the plaintiffs has ever been injured by violence. No strike has ever been called. While there has been a great deal of publicity regarding the organization of the Donnelly employees, the money that is to be used for such purpose, and the probabilities of a strike being called if and when the Donnelly Company refuses to accede to the demands of the Union, the fact remains that the General Executive Board of Inter-

national alone has authority to authorize a strike and no such authorization has ever been given. The statements made by Tobin and certain unidentified strikers at the Kansas City strikes in 1937 to the effect that similar tactics and methods would be employed when the Donnelly strike was called, stand without sufficient evidence of authorization or ratification by these defendants. It must be evident that statements thus made without a showing that these non-resident defendants authorized such threats, or ratified them after actual knowledge, cannot bind these defendants. The Norris-LaGuardia Act is very specific that no officer or member of any association or organization "shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." Section 6.

It is argued that the series of acts of violence in the Dallas, Memphis and Kansas City strikes, all of the same pattern, and the tacit approval thereof by these defendants, are sufficient to prove that there was a concert of action or understanding among these defendants to carry on such strikes with violence and intimidation. But before equitable relief can be granted herein, the Court is required to find that there is a present conspiracy among two or more of these defendants to commit, direct, or encourage violence against the Donnelly Garment Company, and before the Court would be justified in making such a finding, there must be clear and satisfactory proof of such a conspiracy. True, these defendants have indicated as official representatives of International that neither money nor effort would be spared to unionize the Donnelly employees. But it would be a rather violent assumption for this Court to conclude or to infer that, merely because the record of International in the strikes that occurred in 1935 and 1937 is to be condemned, violence will in all reasonable probability occur when and if International calls a strike as against the Donnelly Company, and secondly, that such violence would be instigated by these defendants. Regardless of the seeming indifference to the violence which was condoned by certain representatives, at least, of International in 1937, this Court, under the evidence, would not be justified in stigmatizing the International or these defendants as an outlaw organization or group, one which would in all reasonable probability use force and violence if and when a strike were called. If plaintiffs are entitled to an injunction herein on the theory of threatened violence, then whenever International plans the organization of a garment factory in any place in the United States, and a strike is threatened, an injunction should issue against the General Executive Board because of International's past misdeeds. Such reasoning cannot be sustained, neither under the facts herein nor under the plain intent of the Norris-LaGuardia Act.

It is fair to observe in passing that great changes have taken place in the industrial situation since the days of the Gernes, Gordon and Missouri strikes. The National Labor Relations Act, 29 U.S.C.A. § 151 et seq., has become an important factor in administering and controlling the rights of employers and of the unions with reference to collective bargaining and the representation of employees. The National Labor Relations Board has conducted lengthy hearings regarding the legality of the present Donnelly Union and has filed its decision wherein it is held that the Donnelly Garment Company has engaged in unfair labor practices (1) by interfering with, restraining and coercing the employees in the exercise of collective bargaining rights; (2) by dominating and interfering with the formation of the Donnelly Garment Workers' Union; (3) by discriminating against a member of International in regard to tenure of employment in violation of Sections 8(1), 8(2) and 8(3) of the National Labor Relations Act. The period when these strikes occurred and violence ensued was during the time of the depression, which, since the advent of the War, has substantially subsided. Major unemployment no longer exists. Union labor has made marked advances in membership and power since 1937, and while strikes and threats of strikes are all too frequent in these war times, violence, sit-down strikes, and similar activities are less frequent. Many Unions have given a no-strike pledge during the period of the War, and International has publicly dedicated itself to a policy that no strikes shall be called during the duration of the present War at any factory which has war contracts. The Donnelly Company is now engaged in performing war contracts. Again, it may be pointed out that no restraint has been placed on the activities of

International in organizing the Donnelly Company since 1941. No charge is made that any illegal activities, or threats thereof, have taken place since that time. In fact, no charge is made that any threats of violence or violence have taken place during the past six years in the entire Southwest area in connection with International's activities. It is urged by plaintiffs that, as long as the present proceeding is pending, International will refrain from any type of active organization or the employment of any tactics which might be harmful to their position in this Court. It is reasoned, therefore, that, if an injunction is denied, the representatives of International will soon begin their campaign of intimidation and violence against the Donnelly Company. There may be some basis for the fears indicated by plaintiffs, but if labor difficulties occur at the Donnelly factory in the future, and the rights of the plaintiffs are violated by illegal activities of the strikers and others, the plaintiffs are not without a remedy. The State courts, as well as the Federal courts, will undoubtedly be functioning in the State of Missouri at that time. It must be remembered that equity generally acts in the present, and the purpose of an injunction is to prevent or to deter future injury which will in all reasonable probability result—not to punish for past misdeeds. Equity will not act merely because of apprehension or fear, but it must be made to appear that, without the aid of equity, irreparable damage will probably occur at the present time, not in the remote future. This view is succinctly and clearly set forth in Joyce, Injunctions (1909) § 17:

"A mere possibility, or anything short of a reasonable probability of injury to plaintiff is insufficient to warrant an injunction in his favor. So it has been declared that the mere apprehension of some future acts of a wrongful nature, which might be injurious to the plaintiffs, is not a sufficient basis for insisting upon the preventive remedy of a final injunction, as such a remedy becomes a necessity only when it is perfectly clear upon the facts that, unless granted, the complainant may be irreparably injured and that he can have no adequate remedy at law for the mischief occasioned. * * * There must be a well grounded apprehension of immediate injury to plaintiff."

The order of the National Labor Relations Board is being appealed to the Circuit Court of Appeals. If the Board is upheld, the organization of the Donnelly employees, either through their own initiative as an independent Union or affiliating themselves with some national organization, will presumably go forward. Most factories have some kind of an organization wherein the employees can have the benefit of collective bargaining. Any organization which may thus take place should not be hampered, endangered, or confused by the issuance of an injunction based on events which took place over six years ago. On the other hand, if the Board's decision is reversed and the Donnelly Union is not disestablished, a closed shop will presumably continue at the Donnelly Company, and the probability of a strike at the plant engendered by International would seem more remote. The threats of a strike against the Donnelly Company by International have all been conditioned upon the obtaining of a sufficient number of members in the Donnelly factory. Today there is a virtual closed shop by reason of the dominance of the Donnelly Garment Workers' Union.

The Court concludes that equity should not intervene when under all the circumstances at this time injury to the plaintiffs is not reasonably probable. The passage of time in and of itself does not necessarily militate against plaintiffs' rights, but when the alleged continuing menace has thereby been tempered and rendered reasonably remote, the Court's restricted jurisdiction under the Norris-La-Guardia Act should not be invoked. This Court cannot be called upon in this proceeding to punish the wrongdoers for the excesses of 1937.

But there is another reason, and on this record a controlling objection to the issuance of an injunction against these defendants on account of threatened violence. Under the Norris-LaGuardia Act, as a condition precedent to the issuance of an injunction, the court must find: "(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection." That burden which rests upon the plaintiffs to establish affirmatively the inability or unwillingness of the police to furnish adequate protection in the event violence breaks out in any strike which may occur in the future, is an affirmative one. The only direct evidence offered by the plaintiffs in this regard consists of the testimony by an ex-police officer who has not been on the Kansas City police force

since 1939, and his evidence was merely to the effect that the police were unable to quell the disturbance and violence in the Kansas City garment strikes during 1937. It is common knowledge, however, that many changes have taken place since the events referred to. The Police Department of Kansas City has gone through a reorganization. There is an entire change of personnel in its direction and administration. It is highly significant that, when the same question was before Judge Miller in the trial under the Sherman Act and at a time when the events of violence and illegal activities referred to herein were current, the court had this to say with reference to the methods used by the police to curb the violence which took place (Record, page 2581):

"I find from the evidence introduced here that the police department here at one time had at least 70 policemen at its command whom they sent to those plants. It is possible that a city of the size of Kansas City with a police force of at least 70 policemen that they could send to a plant in the city, could not eject in sixty hours, thirty or forty or fifty obstreperous females, not in any wise armed, and barred the doors, if they wanted to protect the property of these property owners? I do not believe it. I do not believe, gentlemen, there is any good faith in that. I saw the pictures of those crowds down there and those policemen milling around among them. I saw them standing laughing, talking with each other, joking, throwing their arms up, not in defense of any of the workers that were going in, but apparently there with no serious intention of dispersing the mob, but to see that no actual murder or manslaughter was committed, perhaps, yes. I do not believe that those policemen were actually in good faith trying to disperse that mob.

"And now, I do not mean either to criticize those policemen that were there. I think it is a matter of common knowledge that soldiers and policemen take orders and usually they obey orders. These policemen who were there on duty day after day, week after week, I think some six weeks, they had to report to their superiors. That is common knowledge. Their superiors knew what was going on down there; they knew that the law was not being enforced, they knew that for those sixty hours these properties were in the hands of a lawless crowd. They knew that that was not peaceful picketing; they knew that the employees of that place had a right to go there and go to work; they knew they were being kept from it and they knew more than that. They knew that if that was kept up long enough, if they permitted those strikers, and their sympathizers there to continue that long enough that they would eventually destroy the property and peace of these owners of these factories and their business, and that they would be compelled to yield and sign up by force and violence, and that is just what happened there.

"Now, I realize that it is a sinister picture for this court to find that the heads of your police officers in this city, your Police Director if that is what you call him, your City Manager, if that is what you call him—the ones who have the authority to direct the police, to charge them with an unwillingness to enforce the law because it means exactly this, that the very police force of your city that is elected or appointed for a sole purpose, and that sole purpose is to maintain law and order and to protect the law abiding citizens and the people of your community from the lawlessness, have been unwilling to perform that simple duty for which they are paid by the public, and that they have actually connived in truth and in fact with the lawless element of your city in taking the property of the owners in its lawful use and its possession from them; that they have actually connived with the lawless strikers and their sympathizers to prolong a situation that they could easily have handled, had they wished, to the end that that lawless crowd would eventually compel them to sign up against their will and their wishes.

"Now, gentlemen, that is the plain naked truth of this situation as the picture is shown to me and that is what I am going to find as facts in this case, much as I would prefer not to have to do that."

Certainly, in light of that commentary, the evidence of an ex-police officer is not entitled to much consideration in weighing the showing that plaintiffs have made in attempting to comply with the section of the Norris-LaGuardia Act referred to. Moreover, there is no testimony that the present police force is unable or unwilling to cope with any violence which may occur on the picket line or elsewhere, if and when a strike occurs at the Donnelly Company's plant, or otherwise to protect the employees who may not be in sympathy with any strike called by International. Plaintiffs cannot rest merely on the expe-

rience in other cities and conclude that, because violence there was uncontrolled, the Court should find that they have complied with the condition precedent referred to. Congress never intended that the United States courts should police the activities of strikers in absence of an affirmative showing that the public officials of the locality in which the acts or threatened acts of violence occurred, could not, or would not, give adequate protection. Plaintiffs urge that experience has shown that, when women go on strike, the police are loath to use any methods which might be considered severe in curbing any violence which they may use, and for that reason it will inevitably follow that the public officials will be impotent to handle a group of women strikers who are bent upon mischief. Apparently, Judge Miller entertained no such view and this Court would not be justified in concluding otherwise. As stated by the Circuit Court of Appeals of the Fifth Circuit in referring to this section of the Norris-LaGuardia Act in Carter v. Herrin Motor Freight Lines, 131 F.2d 557, 561:

"We sustain their position, too, that though pleaded and found, the facts did not support the pleading and finding, that the local authorities, whose business it was to keep the peace, could not or would not furnish adequate protection. This provision of the statute, like the one just above discussed, was not written in the act as a merely perfunctory gesture, it may not be perfunctorily complied with. It expresses the legislative conviction that acts of violence and breaches of the peace in connection with labor disputes, which, and not the disputes themselves, are enjoinable under the act, ought not to be relieved against by injunction unless the local authorities whose duty it is to keep the peace have first been resorted to, and have either advised that they could not or would not keep it or advising that they could and would, have failed through inability or unwillingness to do so. It is, therefore, of the very essence of the right to apply for injunctive relief in a federal court that the statutory allegation be made and definitely proven. Though made here, it was not proven."

See, also, Green v. Obergfell, 73 App. D.C. 298, 121 F.2d 46, 53, 138 A.L.R. 258.

### Fraud

In discussing plaintiffs' application for an injunction against fraud, it must be remembered that it is not contended that any fraudulent statements were made after January, 1939. Moreover, the alleged fraudulent statements were made as to conditions which were claimed to have existed in 1937 and 1938. In view of the many changes which have taken place since those years, it is highly improbable that defendants would, in the future, ever assume to describe conditions in plaintiffs' factory of some five or six years ago as a weapon in carrying out the organization of the Donnelly employees. It may be noted that the Fair Labor Standards Act of 1938, 29 U.S. C.A. § 201 et seq., which would govern the minimum wages paid to employees in this factory and the rates to be allowed for overtime, came into effect in October, 1938. The War has not only stimulated employment, but it has occasioned the manufacture of garments by the Donnelly Company and changed working conditions which certainly were not envisaged by anyone in 1937 or 1938. Comparisons between the Donnelly Company and other factories as to working conditions, wages, etc., as of five or six years ago are now entirely passe. Any campaign which defendants might adopt in the future in the organization of the Donnelly employees will not refer to labor conditions in the Donnelly factory that existed long before the present War. It is entirely probable that some of the statements which must be characterized as untrue were made after representatives of International had obtained only a partial picture of the true conditions prevailing at the Donnelly factory. The very fact that this lengthy litigation and other proceedings have explored the true conditions in the Donnelly factory and have brought to light more accurate information regarding the wages, working conditions, etc., the repetition of statements hereinafter found to be false or fraudulent is indeed unlikely. In view, however, of the great amount of evidence adduced by both parties touching upon the truth or falsity of the statements contained in the circular disseminated in 1937, it may not be amiss for the Court to indicate briefly its views as to the weight of the evidence in this regard.

In the pamphlet addressed "To the Consuming Public," the first paragraph consists of an appeal to the public not to buy or sell Nelly Don dresses. Presumably, in a labor dispute, no valid objection can be lodged against such an appeal. The second paragraph reads as follows:

"The workers of the Donnelly Garment Company are compelled to work long hours while their wage scale is far below that

which prevails everywhere else in the dress industry. The speed-up system is such that most of the 1300 workers employed by this firm are in a state of exhaustion and fatigue. Many of them must have constant medical attention because of the nervous strain imposed upon them by this system. Numerous workers suffer complete nervous break-downs."

Under the evidence, the last three sentences are not only false, but it is the Court's opinion that they were made knowing them to be false, or with a reckless abandonment without making a complete investigation, in order to create prejudice among the trade and public against the products of the Donnelly factory. As such terms are generally and usually understood by the public, there was no speed-up system in the Donnelly establishment. The workers were not in a state of exhaustion and fatigue. They were not in constant need of medical attention. Numerous workers did not suffer complete nervous break-downs. There is no possible excuse for the use of such false and extremely prejudicial statements against a concern whose factory, in so far as working conditions, wages, and consideration for the employees are concerned, ranked with the best in the Middlewest. The statement in the first sentence of the paragraph quoted that Donnelly employees were compelled to work long hours is not true. The evidence does indicate that, during the busy season, employees often worked overtime, but the extra work was optional with the employees. They were paid for the overtime and the inference that the employees were required to work long hours against their will is contrary to the clear weight of the evidence.

The charge in the third paragraph of the circular that there was a spy system "under the direct supervision of a notorious strike-breaking detective agency, through which every worker is spied upon," was likewise false. There never was any detective agency hired by the Donnelly Company to spy upon the employees, and there is not a vestige of support for the statement thus made. The charge that anyone who complained of conditions or joined a labor organization or expressed a favorable opinion of a union was immediately discharged, was false. There was at all times an excellent relationship between the employees and the employer in the Donnelly factory. Some employees were members of unions and this fact was known to the company. That the employees felt free to complain of any adverse conditions which might exist is free from doubt. Undoubtedly, there was not a friendly attitude on the part of the employer towards the International, and employees may have been laid off in preference to others if it appeared that they were too friendly with the organizers or purposes of this Union, but the bald statement that appears in the third paragraph of this circular is untrue.

In this pamphlet was included the letter of March 9, 1937; that is, the letter sent to the Donnelly Garment Company by International through Perlstein and Tobin. Plaintiffs contend that many statements contained in this letter are false and fraudulent. The second paragraph of this letter charges that some fifteen members of International were discharged by reason of their affiliation with the Union. Under the evidence, the Court would not be justified in making a finding that this statement was false and fraudulent. Two examiners of the National Labor Relations Board have found that there was anti-union discrimination, and the Board, by its order, has affirmed the report of the examiners. While the evidence at the trial was conflicting on this issue, there is evidence which if believed fairly substantiates this charge. In any event, the Court is satisfied that the plaintiffs have not established by the greater weight of the evidence that the statement was knowingly false.

The charges in the second paragraph of the letter in which the Donnelly Company is referred to as being in the dress industry brings up a long-debated and long-standing controversy as to whether the Donnelly Company should be classified as a manufacturer in the dress industry or one in the cotton garment or house dress industry. The question has been a controversial one ever since the days of the N.R.A. It appears that, in the dress industry, the practice is for one operator to complete substantially—that is, to sew—the entire dress. In the Donnelly factory, the sectional work system is employed in which each operator is only required to perform one or two out of some twenty to forty operations in the manufacture of a single dress. The plaintiffs urge, therefore, that in the dress industry skilled dressmakers are required in order to do the entire work necessary to be done on a dress, and hence higher wages may be paid in such a factory than in a factory like Donnelly's where the operators are not necessarily skilled dress-

makers, but are simply trained to perform one or two operations on a dress. Much testimony has been addressed to this question, but in view of the conclusions reached a lengthy discussion seems quite unnecessary. However, it may be stated that house dresses are garments suitable for utility wear about the house. They are generally, but not exclusively, made of washable cotton material and sell at a price appreciably lower than the dresses made by the so-called dress manufacturers. It does appear that, during the period in question, the bulk of plaintiffs' products wholesaled above $22.50 per dozen, which price is comparable to that received for dresses manufactured by the so-called dress industry. Moreover, the Donnelly Company uses not only cotton goods in the manufacture of their dresses, but also rayons, silks, acetates, linens, woolens, etc. Their dresses are suitable for afternoon wear, the theater, social gatherings, and the like. There is an abundance of testimony, and the conclusion is quite impelling, that the average purchaser could not tell the difference between the higher-priced dress manufactured by the Donnelly Company and a dress from a factory in the dress industry. In other words, the Donnelly product compares favorably with such dresses as to price, style, material, and use. Granted that there are differences in methods of manufacture and in the sale of the Donnelly garment, such differences are not controlling as to the question presented. Persons may differ as to the correct classification of the Donnelly Company as a dress manufacturerer or a house dress manufacturer, but, under the evidence, the Court would not be justified in finding that the statement that the Donnelly Garment Company is engaged in the dress industry is false and fraudulent.

The statement in the letter that "in your shop the minimum wage scale for operators is between $12.50 and $15.00 per week" is substantially true. Likewise, the statement that, "The hours of work in your shop are 40 and more per week" is fully sustained by the evidence. The statement that, "The piece workers in your shop have no voice as to what the piece rates should be as they are set exclusively by representatives of your firm," is undoubtedly a correct statement as to the conditions which prevailed when this letter was written. It fairly appears, and in fact is not denied, that the employer determined the piece rate and its determination was final. The statement that plaintiffs' "wage scales for fin-

ishers, pressers and cutters are at least 30 per cent lower than those which exist in the industry," and the statement which charges that, "In comparison with other shops in the industry which produce the same type of garment the production in your shop is about 30 per cent higher while the earnings of the workers are about 30 per cent lower," are challenged by the plaintiffs. But in so far as wages are concerned, the only basis of comparison is the wages paid under the Donnelly Garment Workers' Union contract of June 22, 1937. It will be observed that this contract was entered into some three and one-half months after the letter of March 9th. The evidence does indicate that, as compared to certain factories in other parts of the United States, there are differentials against the plaintiffs as to wages paid for operators, pressers and cutters. Then, again, plaintiffs' wages for such employees exceed those of other garment factories. It is true that the terms "cutters, pressers and finishers" sometimes embrace different duties in the shops in various localities. Under the Donnelly contract with the Union, there is no craft known as "finishers", and there are specialized groups which cannot readily be compared with classifications of employees used in other factories. It may be observed in passing, moreover, that in some instances the evidence reflected a clear non-compliance with some of the provisions of the Donnelly Union contract as to wages during the period referred to. Comparison of the Donnelly Company with the rest of the industry as to production largely resolves itself into expressions of opinion, and there are so many ramifications in such a comparison that it is difficult to arrive at any satisfactory conclusion. To a certain extent the same observation may be made regarding the comparison of wages. In certain factories in the dress industry in the large cities of the East and far West, operators, cutters and pressers undoubtedly receive higher wages than the craftsmen bearing the same titles in the Donnelly factory. However, the sectional system which the Donnelly Company employs in manufacturing dresses enables them to utilize help who probably could not perform the skilled work which falls to the workers in the same classification in some of the factories used in the comparative studies. Certainly, it must be recognized that, generally speaking, the Donnelly Company, as compared to other garment factories using employees of comparable skill and experience, ranks with the

best as to wages and working conditions and is far superior to most of them. It is quite probable, therefore, that the public, in reading this portion of the circular, might be misled as to the true conditions in the Donnelly factory, and while from the evidence based on statistics and the data produced the charges may not be termed wilfully false, they are misleading and may result in an entirely erroneous impression of the wages and working conditions in the Donnelly factory.

The paragraph reading "The conditions and wages under which your employees are working not only deprive them of the privileges and opportunities enjoyed by the workers in this industry, but endanger their general work standards and wage scales. Your firm has undue and unjustified advantages over your competitors. The Union believes in 'Fair Competition,' but it does not consider competition fair when it is gained solely at the expense of the workers"—is in the main an expression of opinion, and under the evidence cannot be characterized as false and fraudulent. The same observation may be made as to the remainder of the contents of the circular.

 This circular was distributed among hundreds of Donnelly's customers. As indicated above, some of the charges were recklessly made and were not only false, but were made by Perlstein and Tobin with the knowledge that they were false, or at least without taking sufficient care to ascertain whether they were false or true. But in determining plaintiffs' right to equitable relief, certain uncontradicted and elementary considerations seem controlling. At the outset, it must be remembered that the conditions referred to are alleged to have existed in 1937 and 1938. We are considering the right to equitable relief, not the right to damages. When the three-judge decision was handed on December 31, 1937, 21 F.Supp. 807, this circular was abandoned by Perlstein, and the second circular drafted as to which no charges of fraud are directed. True, there is some evidence that the first circular was distributed in 1938, but it is to be doubted that it was distributed or circularized at that time with the sanction of any of these defendants. Certainly, there is no justification for a finding that any of these defendants had in any way authorized, or had any actual knowledge of, the distribution of the first circular after the injunction was issued by the three-judge court.

In fact, outside of the defendant Perlstein, the evidence is insufficient to indicate that the defendants knew of the falsity of any of the material in the circular at the time of its issuance or ratified it after knowledge of its falsity in any particular. Confronted, therefore, with a showing that impels the finding that any fraud committed against these plaintiffs ceased nearly six years ago, and believing in light of the events which have taken place thereafter that there is no reasonable probability that the same false statements will be again circulated, it seems clear that equity should not act. As stated by our Circuit Court in Champion Spark Plug Co. v. Reich, 8 Cir., 1941, 121 F.2d 769, 772:

"When an injunction is sought to restrain a continuing injury and, after suit is brought the defendant claims to have abandoned the course of conduct complained of, the question for the court to determine is whether the illegal conduct has in fact been abated or whether the menace to the plaintiff's rights still exists. If the menace exists an injunction should be granted; if not, it should be denied. * * * The question is one of fact for the determination of the court at the time the final decree is entered."

### Secondary Boycott

Section 4 of the Norris-LaGuardia Act provides as follows:

"No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts: * * *

"(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; * * *."

 The circularization or broadcasting of information to the public and the employer's customers regarding the difficulties between a union and an employer is thus expressly permitted. A fair construction of this section of the Act indicates that Congress intended that the facts of a labor controversy might be given publicity by the patrolling of the streets or otherwise with banners or signs, and that such publicity might include or contain a

request to the public not to buy the products of the factory where the labor dispute exists. Any views to the contrary expressed in Duplex Printing Press Company v. Deering, 1920, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196, and Bedford Cut Stone Company v. Stone Cutters' Ass'n, 1927, 274 U.S. 37, 47 S.Ct. 522, 71 L.Ed. 916, 54 A.L.R. 791, which decisions were handed down prior to the passage of the Norris-LaGuardia Act, have now, in light of the specific provisions of said Act, been explicitly, and apparently designedly, overruled. United States v. Hutcheson, 1941, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788; Milk Wagon Drivers' Union v. Lake Valley Farm Products, Inc., 1940, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63; Wilson & Co. v. Birl, 3 Cir., 1939, 105 F.2d 948; Taxi-Cab Drivers Local Union No. 889 v. Yellow Cab Operating Co., 10 Cir., 1941, 123 F. 2d 262; Levering & Garrigues v. Morrin, 2 Cir., 1934, 71 F.2d 284. The contention that United States v. Hutcheson, supra, merely overruled the Duplex case with respect to its holding that the immunities of Section 20 of the Clayton Act, 29 U.S.C.A. § 52, do not arise unless the dispute is between employer and employee, does not seem sound. The Supreme Court clearly enunciated the view that the Norris-LaGuardia Act was a disapproval of the teachings of the Duplex and Bedford Stone Company cases. In other words, the limitation on what can be done, and by whom, in a labor dispute, as taught in the Duplex and Bedford cases, is no longer sound in view of the express provisions of the Norris-LaGuardia Act.

There was no violence in the publicizing of the labor difficulties to the customers of the Donnelly Company. There were certain statements made by emissaries sent out by International which may be susceptible of a threat to boycott the stores which did not cease selling the Nelly Don dresses. However, the evidence fails to substantiate the contention that any one of these defendants authorized such threats or ratified them after actual knowledge. As heretofore stated, the distribution of fraudulent statements contained in the circular of March 9, 1937, has now been abandoned. Reference is made to certain statements in the columns of "Justice" to the effect that the stores handling Nelly Don dresses would be picketed or boycotted, but a fair consideration of those articles and any statements of alleged threats of these defendants requires a finding that the expression of International, or of these defendants, referred to a boycott of the product and not a boycott of the stores handling the product. It now appears that, for over five years, no illegal activities have been carried on or threatened with reference to any alleged boycott of stores handling the products of the Donnelly Company and it is the Court's opinion that, whatever illegal activities, or threats thereof, in which any of the emissaries purporting to represent International were engaged, they were not authorized or ratified by these defendants, and that such activities and threats have long since been abandoned and there is no reasonable probability of their recurrence in the future.

### In General

The Court has not considered the effect of the order of the National Labor Relations Board, which found the Donnelly Garment Company to be guilty of certain illegal labor practices. Defendants contend that the Donnelly Company has failed to comply with an obligation imposed by law, and therefore, under the Norris-LaGuardia Act, cannot obtain any injunctive relief. It is pointed out that the National Labor Relations Act imposes a legal obligation on all employers not to engage in "unfair labor practices" and that the order of the Board has found that the Donnelly Company has violated the Act in that regard. It appears that the order of the Board is now before the Circuit Court of Appeals for review. In view of the appeal of that decision and the denial of the application for injunction herein on other grounds, it does not seem necessary to determine whether the Board's order is now final as the defendants urge. Certainly, it would seem that, if the Board's order is sustained by the Circuit Court of Appeals, the Donnelly Company has "failed to comply with" an "obligation imposed by law which is involved in the labor dispute in question." And under Section 8 of the Norris-LaGuardia Act, no restraining order or injunctive relief could be granted in its behalf in this proceeding. Section 8 apparently assumes to impose on applicants for equitable relief in a labor controversy the equitable maxim that he who seeks equity must do equity. See, Brotherhood of Railroad Trainmen v. Toledo, Peoria & Western Railroad, 321 U.S. 50, 64 S.Ct. 413.

Neither has the Court endeavored to make any finding on the compliance of plaintiffs with the obligation imposed on them by the Norris-LaGuardia Act to make

every reasonable effort to settle the dispute. In view of the disposition of this case, a discussion of this controversial matter seems unnecessary. Some of the evidence offered at the trial was only received as to certain defendants and ruling was reserved as to its admissibility as to other defendants. In view of the fact that the Court has considered and weighed all of the evidence as if it had been received as to all of the defendants, it would seem that no further ruling is necessary.

 In conclusion, the Court should state that, under the Norris-LaGuardia Act, strict compliance with its purposes and conditions precedent is unquestionably mandatory.

"The fact must not be lost sight of, that however narrow the scope of injunctive relief may be in form, the issuance of the writ for any purpose in a labor dispute will generally tip the scales of the controversy. Plainly this was the very evil against which the Norris-LaGuardia Act was basically directed. In effectuating the purpose of the Act, therefore, the exceptions which have been left open to injunctive process may not be treated lightly, or as if the Act had never been passed, but should be viewed restrainedly, as a narrow field of permissive jurisdiction, exercisable in the interest of a public policy co-ordinate with that aspect upon which the prohibitions of the statute rest." International Ass'n of Bridge, etc., Workers v. Pauly Jail Bldg. Co., 8 Cir., 118 F.2d 615, 616.

Injunctions should not be granted merely because no demonstrable harm will result to the defendants by their issuance or to establish that past wrongs may have occurred. It is an extraordinary remedy which should only be granted with caution in view of the restricted jurisdiction of this Court. One cannot escape the impelling fact that the passage of years, the change in the parties defendant, and the altered circumstances since April, 1939, have unquestionably modified and changed the situation which confronted Judge Miller when he entered the injunctive order based on the Sherman Act. If the Court is correct in its premise that the basis for injunctive relief should be the present, reasonable probability of injury to the plaintiffs, threatened or caused by the wrongful acts of the defendants, it must follow that, on this showing, if for no other reason, equity should not now interfere with any labor dispute which may exist between the parties.

The application for an injunction, therefore, is in all things denied, and defendants may, upon reasonable notice, submit findings of fact and conclusions of law consistent herewith. An exception is allowed to the plaintiffs.